**AMHERST COAL COMPANY, a corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**AMHERST INDUSTRIES, INC., a corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**AMHERST FUEL COMPANY, a corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 2604–2606.**

United States District Court
S. D. West Virginia,
Charleston Division.

Jan. 20, 1969.

---

Thomas N. Chambers, Homer A. Holt, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., for plaintiffs.

Myron C. Baum, G. A. Hrdlicka and Herbert Odell, Dept. of Justice, Washington, D. C., and Milton J. Ferguson, U. S. Atty., Charleston, W. Va., for defendant.

## OPINION

FIELD, Chief Judge.

These three actions, to some degree, involve common questions of law and fact, and were consolidated for trial and decision. Jurisdiction is conferred by Title 28, U.S.C.A. § 1346(a) (1), and is unchallenged by the Government.

In Civil Action No. 2604, Amherst Coal Company seeks to recover the sum of $741,450.31, representing an alleged overpayment of Federal income taxes and interest thereon for the years 1953 through 1957, inclusive.

In Civil Action No. 2605, Amherst Industries, Inc., formerly Amherst Barge Company, seeks to recover the sum of $91,542.34, representing an alleged overpayment of Federal income taxes and interest thereon for the years 1953 through 1956, inclusive.

In Civil Action No. 2606, Amherst Fuel Company seeks to recover the sum of $115,924.45, representing an alleged overpayment of Federal income taxes and interest thereon for the years 1953 through 1956, inclusive.

Briefly stated, the questions presented for disposition in Civil Action No. 2604 are as follows:

(1) During the years 1950 and 1951, Hatfield-Campbell Creek Coal Company sustained substantial net operating losses. On December 31, 1952, Hatfield and Amherst Coal Company merged with Amherst Coal as the surviving corporation. The question is whether Amherst Coal is entitled to carry forward and deduct the unused premerger net operating losses of Hatfield to the extent of income earned by Amherst Coal from a continuation of the Hatfield business. This issue, which will be referred to as the "net operating loss issue," is common to all three of these consolidated cases and is the only issue involved in Civil Actions Nos. 2605 and 2606.

In disposing of this issue it is necessary to determine, first, whether in any event Amherst Coal is entitled to carry over and deduct from its income for the years in question all or any part of the premerger Hatfield losses under the circumstances here present; and, second, if such loss carryover is permissible, whether there was during the years in question postmerger income to which the premerger net operating loss might properly be applied.

(2) Whether the construction cost of two mine access roads constructed by Amherst Coal in the years 1953–1954 and 1956–1957, in connection with its mines may be deducted in full in the respective years of payment as mine development expenditures, or must be capitalized and amortized over the life of the mines.

(3) Whether Amherst Coal is entitled to include the sum of $217,857.89, which it received in 1953 from J. H. Dillon Coal Company in settlement of a breach of contract action, as a part of its "gross income from mining" for percentage depletion purposes, or should treat such sum as ordinary income ineligible for the depletion allowance.

(4) Whether the sum of $40,000 paid by Amherst Coal to the Kanawha & Hocking Coal & Coke Company in 1955 in set-

tlement of a "lost coal claim" may be deducted in full in the year of payment as an ordinary business loss or an advance royalty, or on the other hand, resulted in the acquisition of such coal as a capital asset and accordingly should be capitalized.

The question presented for disposition in Civil Action No. 2605, as heretofore stated, involves only the net operating loss issue. As will appear more fully from the findings of fact, on January 1, 1953, after the Hatfield merger, Amherst Coal transferred certain assets formerly owned by Hatfield to Amherst Barge Company (now Amherst Industries, Inc.). During the years 1953 through 1956, Amherst Barge filed separate income tax returns and reported taxable income, part of which income was generated by the Hatfield assets received from Amherst Coal on January 1, 1953. The question is whether under these circumstances Amherst Barge was entitled to carry forward and deduct from its income for the years in question a portion of the losses sustained by Hatfield in 1950 and 1951.

The question presented for disposition in Civil Action No. 2606 is identical to that presented in Civil Action No. 2605. As will appear more fully from the findings of fact, on January 1, 1953, after the Hatfield merger, Amherst Coal transferred certain assets formerly owned by Hatfield to Amherst Fuel Company. During the years 1953 through 1956, Amherst Fuel filed separate income tax returns and reported taxable income, part of which income was generated by the Hatfield assets received from Amherst Coal on January 1, 1953. The question is whether under these circumstances Amherst Fuel was entitled to carry forward and deduct from its income for the years in question a portion of the losses sustained by Hatfield in 1950 and 1951.

I

NET OPERATING LOSS ISSUE

The evidence in these cases consists of a stipulation of facts, as amended and submitted, together with oral testimony and exhibits received at the trial. Based upon the aggregate of the evidence, the facts bearing on the net operating loss issue are found to be as follows:

1. Amherst Coal Company was incorporated in 1912 and Logan County Coal Corporation was incorporated in 1922. The companies were engaged in the business of producing and marketing coal from about ten mines located in the southern part of West Virginia. Amherst and Logan County were operated by substantially the same management but were not owned by the same interests in the same proportions. These two companies were merged December 31, 1951, with Logan County as the continuing corporation. Shortly thereafter, its name was changed to Amherst Coal Company (Amherst).

2. Amherst Fuel Company (Fuel Company) was organized in 1929 and has been a wholly owned subsidiary of Amherst Coal Company since May 31, 1952. It is the exclusive selling agency for Amherst as it was for Logan County and Amherst prior to their merger December 31, 1951.

3. In order to enter the business of transporting their coal by river barges, Amherst and Logan County authorized on May 9, 1949, the acquisition of river loading and unloading sites, and river transportation equipment, at a cost not to exceed $1,500,000 to each company, and formation of a new corporation to carry out these plans. To this end, and on December 21, 1949, Amherst Barge Company was formed with a paid-in capital of $2,000,000, contributed in equal proportions by Amherst and Logan County. Upon the merger of Amherst and Logan County on December 31, 1951, the barge company became a wholly owned subsidiary of Amherst Coal Company. On October 17, 1960, its name was changed from Amherst Barge Company to Amherst Industries, Inc.

4. Hatfield-Campbell Creek Coal Company (Hatfield) was incorporated under

the laws of the State of Ohio in 1924 as The Hatfield-Reliance Coal Company, and in 1928 its name was changed to the Hatfield-Campbell Creek Coal Company. On December 31, 1952, and for many years prior thereto, Hatfield was engaged in mining, producing, processing, transporting and marketing bituminous coal. Its coal mines were located on lands owned or leased by it in West Virginia and its principal mine was the Point Lick No. 4 Mine operating in the No. 2 Gas Seam on Campbells Creek in Kanawha County, West Virginia. Its subsidiary, Campbells Creek Railroad Company, operated a railroad which, among other things, transported coal from its mines on Campbells Creek to a terminal at the mouth of the creek on the Kanawha River from where barges of Hatfield transported the coal to terminals on the Ohio River at Cincinnati and elsewhere. Its major marketing facility was its dock and coalyard in Cincinnati referred to as the Baymiller Street property. Hatfield had three active subsidiary corporations, Campbells Creek Railroad Company, a West Virginia corporation, The Ohio & Kanawha Transportation Company, a Delaware corporation, and Madison Coal & Supply Company, an Indiana corporation. Additionally, it had five inactive companies without assets which were continued merely for name protection.

5. In each of the years 1946, 1947 and 1948, Hatfield and its subsidiaries operated profitably, earning $841,781.81 on a consolidated basis during the three-year period. Also, during this period, Hatfield embarked upon a program of modernization of its mine, transportation and yarding and storage facilities. Hatfield spent $900,000 to convert the transportation facilities from wood to steel; constructed a modern elevator and storage plant at Cincinnati at a cost of $300,000; contracted in November 1947 for a modern coal cleaning plant for its Point Lick No. 4 Mine, which was completed in 1949 at a cost of approximately $700,000 and completed the Point Lick No. 4 Mine north slope and bathhouse in 1950, at a cost of approximately $157,000,

to serve as a second mine escapeway, for mine ventilation and as an entrance or portal. Also, prior to its acquisition by Amherst and Logan County, Hatfield spent approximately $100,000 on underground mining machinery for this mine.

6. Due to lack of running time of its mines, problems with the new cleaning plant and other causes, Hatfield incurred an operating loss of $293,584.69 in 1949, and continued to operate at a loss up to the time it was acquired by Amherst and Logan County in mid-1950. Hatfield incurred a loss for the first six months of 1950, in the amount of $129,200.38.

7. Acquisition of Hatfield offered several important advantages to Amherst and Logan County, including river transportation facilities consisting of fifty standard steel barges and two steamboats, elevating yards at Cincinnati, Ohio and Madison, Indiana, to serve as outlets for Amherst and Logan County coal, together with the Point Lick mine which produced No. 2 Gas coal, a very excellent domestic coal. Joint acquisition of Hatfield was authorized by the directors of Amherst and Logan County July 11, 1950, and controlling stock interest was purchased by these companies on an equal basis July 21, 1950. Amherst Barge Company, which had by this time acquired only a boat, ten barges and an undeveloped Huntington, West Virginia river site, discontinued its efforts to enter the river transportation business and leased its river assets to Hatfield.

8. On August 4, 1950, officers of Amherst and Logan County assumed operating control of Hatfield and on September 15, 1950, the entire Board of Directors of Hatfield was replaced by representatives of Amherst and Logan County. Upon the Amherst, Logan County merger, December 31, 1951, Hatfield became, substantially, a wholly owned (9+%) subsidiary of the continuing merged company, Amherst. The operation of Hatfield as a separate legal entity continued until December 31, 1952, when, pursuant to a merger agreement adopted

August 25, 1952, Hatfield and Amherst were merged, with Amherst as the continuing corporation.

9. At the date of merger, Hatfield had an unused net operating loss available for carry forward to 1953 of $841,720.67, composed of a net operating loss for the year 1950 of $536,127.39, and a net operating loss for 1951 of $305,593.28. (Because Hatfield had incurred a loss in 1949, the 1950 loss could not be carried back.) For the calendar year 1952, Amherst Coal Company and its subsidiaries, including Hatfield, filed a consolidated return. While there was substantial net income on a consolidated basis in 1952, none of the Hatfield loss carry-over could be used and none was claimed because Hatfield continued to reflect a loss. Therefore, the unused Hatfield loss continued to be $841,720.67.

10. Upon merger of Hatfield and Amherst, the Hatfield business activities and assets were reorganized in accordance with an intercompany memorandum dated October 23, 1952, prepared by Mr. W. F. Miller, Vice President, Secretary and Treasurer of the Amherst companies. The purpose of this reorganization was to simplify the corporate structure of the various members of the group of Amherst corporations and to eliminate duplicate business functions performed by members of the group, so that one company (Amherst Fuel) would handle all coal sales, wholesale and retail, one company (Amherst Barge) would handle river transportation and the parent company (Amherst Coal) would operate the mines, stores and houses. Pursuant to this memorandum of October 23, 1952, the following actions were taken:

(a) On November 30, 1952, Hatfield's river subsidiary, Ohio and Kanawha Transportation Company, was dissolved and its assets taken over by Hatfield. Upon its merger with Amherst, the former Ohio and Kanawha facilities were included in the list of Hatfield assets which Amherst Coal Company transferred to Amherst Barge Company as of January 1, 1953.

(b) Hatfield and Amherst were merged as of the close of business December 31, 1952. This was a statutory merger under state law and is recognized as such in the context of this litigation by both the government and the taxpayers.

(c) Effective January 1, 1953, Amherst Barge Company (now Amherst Industries, Inc.) assumed the conduct of all of the river dumping, river transportation and river elevating business formerly conducted by Hatfield. The Barge Company also assumed operation of the shipways, repair docks and shops at Reed, West Virginia, and assumed Hatfield's contractual obligations to service and repair the rolling stock of the Campbells Creek Railroad Company. Amherst Barge Company received from Amherst Coal Company on January 1, 1953, all of Hatfield's assets theretofore used to carry on these activities solely in exchange for 8,800 additional shares of its stock. The assets transferred had a book value of $881,368.41 and were adjusted on later Revenue Service audit to $897,052.93.

(d) Effective January 1, 1953, Amherst Fuel Company assumed the retail coal sales business previously conducted by Hatfield in Cincinnati, Ohio, and Reed, Kanawha County, West Virginia, operating in the Cincinnati area under the trade style, "Hatfield Coals, a Division of Amherst Fuel Company." Amherst Fuel Company received from Amherst Coal Company on January 1, 1953, all of the Hatfield facilities and coal inventories used to carry on these activities at their book cost of $416,190.68. On January 1, 1955, Amherst Barge Company transferred to Amherst Fuel Company certain plant and equipment located at Baymiller Street, Cincinnati, Ohio, which had been operated by Hatfield prior to the merger at their book cost of $141,963.94. These assets have since been operated by Amherst Fuel Company. There has been no other intercompany transfer of former Hatfield assets.

(e) Effective January 1, 1953, Amherst Coal Company assumed operation

of the Point Lick No. 4 Mine, the tenements and commissaries formerly operated by the Hatfield-Campbell Creek Coal Company in Kanawha County, and the conduct of all other business not transferred to the Barge or Fuel Company. General accounting was transferred to Lundale, West Virginia, where it remained until 1955, when it was moved to a Hatfield building at Campbells Creek, Kanawha County, West Virginia. This building was rehabilitated and in February 1956, the executive and accounting departments of Amherst, its subsidiaries and the Charleston sales office of the Fuel Company were moved to it.

11. Apart from transfers to subsidiaries as stipulated, no significant Hatfield assets, activities, or businesses were transferred, sold or discontinued after merger.

12. Amherst Coal Company and all of its subsidiaries operated profitably in the postmerger years, 1953–1956, inclusive. Amherst Coal Company realized a net taxable income for this period of $3,084,635.49. Campbells Creek Railroad Company, which as a Hatfield subsidiary lost $52,121.22 in 1950, realized a net taxable profit of $111,554.24 during the years 1953–1956, as an Amherst subsidiary. The 1950 net operating loss of the Railroad was utilized by it to offset income earned in 1951 and subsequent years. Amherst Barge Company, (now, Industries) realized a net taxable income of $242,670.68 during 1953–1956. Amherst Fuel Company realized a net income of $663,365.74 during 1953–1956.

13. In regard to Amherst Barge Company, the stipulation between the parties states, in part, as follows:

"(e) Utilizing the Hatfield assets thus transferred to it, together with its own assets, Amherst Barge Company carried on the river transportation business and related activities and earned the following net income, as determined by the Internal Revenue Service Audit Report dated May 26, 1960, for the period 1953–1956:

| Year | Taxable Income |
|---|---|
| 1953 | $57,314.10 |
| 1954 | 33,659.46 |
| 1955 | 79,106.91 |
| 1956 | 72,590.21 |

"(f) The Government contends that no part of the Hatfield losses incurred in 1950 and 1951 may be carried forward and applied to reduce taxable income of Amherst Barge Company (now Amherst Industries, Inc.), under any circumstances. To facilitate the trial of these actions, however, it is stipulated that, if appropriate for application, the following sums of Amherst Barge Company income may be accepted as income attributable to the continuation of a business formerly conducted by Hatfield:

| Year | Income earned from Hatfield business |
|---|---|
| 1953 | $ 57,314.10 |
| 1954 | 23,179.69 |
| 1955 | 59,220.96 |
| 1956 | 50,090.21 |
| | $189,804.96" |

14. In regard to Amherst Fuel Company, the stipulation states, in part, as follows:

"(c) Utilizing the Hatfield assets thus transferred to it, together with its own assets, Amherst Fuel Company carried on the wholesale and retail coal business and earned the following net income, as determined by the Internal Revenue Service Audit Report dated May 26, 1960, for the period 1953–1956, as follows:

| Year | Taxable Income |
|---|---|
| 1953 | $109,079.38 |
| 1954 | 119,604.18 |
| 1955 | 172,024.96 |
| 1956 | 262,657.22 |

"(d) The Government contends that no part of the Hatfield losses incurred in 1950 and 1951 may be carried forward and applied to reduce taxable income of

Amherst Fuel Company under any circumstances. To facilitate the trial of these actions, however, it is stipulated that, if appropriate for application, the following sums of Amherst Fuel Company income may be accepted as income attributable to the continuation of a business formerly conducted by Hatfield (that is, the Hatfield Coal Division, Cincinnati, Ohio, and Reed Retail Division):

| Year | Income |
|------|--------|
| 1953 | $ 57,283.65 |
| 1954 | 41,916.16 |
| 1955 | 48,637.77 |
| 1956 | 74,051.59 |
| | $221,889.17" |

15. In regard to Amherst Coal Company, the stipulation states, in part, as follows:

"24. It is stipulated and agreed that Amherst Coal Company, subsequent to the merger with Hatfield-Campbell Creek Coal Company December 31, 1952, derived certain income or loss attributable to assets acquired by it from Hatfield and/or used in continuing the prefusion business of such absorbed constituent with respect to such assets, which stipulation is made without prejudice to the right of either party to introduce evidence, not inconsistent therewith, showing the realization by Amherst of additional income or loss attributable to Hatfield assets and/or continuation of the Hatfield businesses.

| Category of Income or Loss | 1953 | 1954 | 1955 | 1956 | Total |
|----------------------------|------|------|------|------|-------|
| Stores | 26,245.25 | 22,785.35 | 25,487.71 | 16,021.22 | 90,539.53 |
| Rents | (15,825.53) | (6,740.81) | (30,179.35) | (11,748.38) | (64,494.07) |
| Gas royalties, less depletion | 5,400.05 | 5,350.70 | 5,510.61 | 5,411.14 | 21,672.50 |
| Sales of scrap | 4,369.38 | 5,850.24 | 8,897.89 | 21,621.44 | 40,738.95 |
| Sales of capital assets | 25,151.44 | 8,989.60 | 27,701.74 | 736.26 | 62,579.04 |
| Cash discounts | 1,428.24 | 1,415.71 | 1,483.47 | 1,789.29 | 6,116.71 |
| Rent of joint facilities | 5,992.38 | 1,080.00 | — | — | 7,072.38 |
| Total | 52,761.21 | 38,730.79 | 38,902.07 | 33,830.97 | 164,225.04" |

*Discussion*

■ The primary issue, of course, is whether on these facts Amherst Coal is entitled to carry over the premerger losses of Hatfield sustained in 1950 and 1951, and deduct them from postmerger income in the years 1953 through 1956 attributable to the continuation of a business formerly conducted by Hatfield; and whether Amherst Coal, Amherst Fuel and Amherst Barge, collectively as "the taxpayer," are entitled to carry over and deduct Hatfield's premerger losses in proportion to the income derived by each corporation during the years in question from the continuation of a business formerly conducted by Hatfield.

The loss carry-over straddles years both prior and subsequent to the passage of the Internal Revenue Code of 1954. However, Section 172(e) of the 1954 Code provides that a prior year's loss deduction carried over to 1954 Code years shall be computed under the law applicable to the prior year, and Section 172(g) of the 1954 Code provides that the determination as to the years ending after December 31, 1953, to which such loss may be carried shall be made under the 1939 Code. Accordingly, the Internal

Revenue Code of 1939 and the decisional law with respect thereto is controlling as to the availability of the carry-over in this case.

Section 23(s) of the 1939 Code authorizes a "net operating loss deduction computed under section 122" of that Code. Section 122(B) of the 1939 Code, as applicable to this case provides that "If for any taxable year beginning after December 31, 1949, the taxpayer has a net operating loss," the loss may be carried back as a deduction against income earned in the preceding year, and, to the extent not exhausted by the carry-back, may be carried over as a deduction against income earned in the five succeeding years. It might be stated here that the government does not assert as a defense or bar to the loss carry-over that the merger of Hatfield and Amherst was effected for the purpose of evasion or avoidance of taxes within the purview of Section 129 of the 1939 Internal Revenue Code.

The leading interpretation of these 1939 Code provisions is found in the landmark case of Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed. 2d 924 (1957), where the Court in effect departed from the "strict entity" principle of New Colonial Ice Co. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348 (1934), and adopted what has been termed the "continuing business enterprise" approach. Bypassing the taxable entity issue, the Court in Libson stated, 353 U.S. at 386, 77 S.Ct. at 992:

"However, we find it unnecessary to discuss this issue since an alternative argument made by the Government is dispositive of this case. The Government contends that the carry-over privilege is not available unless there is a continuity of business enterprise. It argues that the prior year's loss can be offset against the current year's income only to the extent that this income is derived from the operation of substantially the same business which produced the loss. Only to that extent is the same 'taxpayer' involved.

"The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history of the carry-over and carry-back provisions. Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year. There is, however, no indication in their legislative history that these provisions were designed to permit the averaging of the pre-merger losses of one business with the post-merger income of some other business which had been operated and taxed separately before the merger. What history there is suggests that Congress primarily was concerned with the fluctuating income of a single business."

While the Court denied the carry-over to the taxpayer in Libson, it adverted to two First Circuit cases in each of which the taxpayer had prevailed, Stanton Brewery, Inc. v. Commissioner of Internal Revenue, 176 F.2d 573 (1949) and Newmarket Manufacturing Co. v. United States, 233 F.2d 493 (1956). Against the background of these cases, the practical rationale of Libson is stated as follows, 353 U.S. at 388, 77 S.Ct. at 994:

"In the Newmarket case, supra, a corporation desiring to change the state of its domicile caused the organization of a new corporation and merged into it. The new corporation sought to carry back its post-merger losses to the premerger income of the old corporation. But for the merger, the old corporation itself would have been entitled to a carry-back. In the present case, the 16 sales corporations, prior to the merger, chose to file separate income tax returns rather than to pool their income and losses by filing a consolidated return. Petitioner is attempting to carry over the premerger losses of three business units which

continued to have losses after the merger. Had there been no merger, these businesses would have had no opportunity to carry over their losses. If petitioner is permitted to take a carry-over, the 16 sales businesses have acquired by merger an opportunity that they elected to forego when they chose not to file a consolidated return."

After the decision in *Libson,* the Internal Revenue Service issued Rev.Rul. 59–395, C.B. 1959–2, 475, the pertinent parts of which read (at 479):

"Accordingly, absent any evasion or avoidance of tax within the purview of section 129 or other provisions of the 1939 Code, with respect to statutory mergers and consolidations the tax treatment of which is determined under such Code, it is held that (1) following a statutory merger or consolidation, the premerger or preconsolidation net operating losses and unused excess profits credits of an absorbed constituent corporation may be carried over to the resultant corporation to the extent that such losses and unused excess profits credits offset income of the resultant corporation attributable to assets acquired by it from the absorbed constituent and used in continuing the prefusion business of such absorbed constituent; * * *.

\* \* \* \* \* \*

"Further, the taxpayer has the burden of establishing the correctness of the amount claimed as a net operating loss deduction or unused excess profits credit. Even after a statutory merger or consolidation subject to the 1939 Code, if the records of the resultant corporation are not maintained in such manner as to enable the Internal Revenue Service to make a reasonably conclusive determination as to the part of such deduction or credit allocable to the portion of the business of the resultant corporation conducted with the assets of the merged constituent, the claim will be regarded as having failed for lack of proof and will be disallowed."

Unquestionably, absent the merger Hatfield would have been entitled to the benefit of the loss carry-over against profits it might have earned during the 1953–1956 period. It would appear equally clear that had the Amherst reorganization been confined to the merger of Hatfield and Amherst Coal, the latter, as the resultant corporation, would have been entitled to offset Hatfield's premerger losses against income attributable to Hatfield assets and used in continuing Hatfield's prefusion business during the years here in question. In such event Amherst Coal's position would have comported with Rev.Rul. 59–395 since the stipulation clearly demonstrates that the Amherst records were adequate to enable the Service to determine the amount of postmerger income appropriately attributable to the portion of the business conducted with Hatfield assets during the 1953–1956 period.[1]

The government contends, however, that the pattern of the Amherst reorganization is fatal to its position in this case; that since Hatfield had operated as an "integrated" business, the allocation of the Hatfield assets to Amherst Coal, Amherst Barge and Amherst Fuel made it impossible for the three corporations, either singly or collectively, to continue "substantially the same business" as Hatfield within the meaning of *Libson Shops.* From this the government concludes that the Hatfield carry-over is lost in its entirety, and that no part of it is available for use by Amherst Coal, nor for Amherst Fuel or Amherst Barge.

The government's concept of the *Libson* phrase "substantially the same business" would appear to suggest a return to the rigid formalism of New Colonial Ice Co. v. Helvering, supra. It would be impossible to review the many cases and commentaries that have followed in the wake of *Libson,* but a collation of them indicates that in this troublesome area of corporate mergers the courts have

1. Cf. Allied Central Stores, Inc. v. C.I.R., 339 F.2d 503 (2nd Cir. 1964) where the taxpayer was unable to show that post-merger income was produced by the same unit that sustained the premerger losses.

shown an increasing disposition to emphasize substance rather than form.

In Foremost Dairies, Inc. v. Tomlinson, 238 F.Supp. 258, at 261 (M.D.Fla.1963), aff'd 341 F.2d 580 (5th Cir. 1965), the Court stated:

"The decided cases make it clear that the continuity of business enterprise theory enunciated by the Supreme Court in Libson Shops does not turn on the bare legal formalities which are followed in effectuating a merger. In other words, it is not important that, as a matter of form in accomplishing the merger, the same formal legal entity which was in existence before the merger survived the merger and continued as a legal creature thereof. * * *.

"The Court is of the opinion that the continuity of business enterprise theory in Libson Shops means that where a loss corporation and a gain corporation are merged, pre-merger losses may be offset against post-merger gains only to the extent that the business which was previously operating at a loss is now operating at a profit. *Furthermore, the business referred to in the sentence above does not mean the formal legal entity but rather the bundle of assets, which previously constituted the pre-merger business unit.*" (Emphasis added.)

In F. C. Donovan, Inc. v. United States, 261 F.2d 470 (1st Cir. 1958), involving a "carry-back" under the 1939 Code, Judge Magruder rejected what he characterized as "the dry, technical argument" of the government and, quoting *Newmarket,* observed that "taxation is an intensely practical matter, which ought to turn upon economic realities rather than upon technical differences of the corporate entity." He went on to state (at 475):

"Once one gets over the hurdle, as we did in the Newmarket case, that the carry-back privilege is available only where the identical 'legal entity' which had earned the income suffered the loss, it would seem a sterile technicality, and wholly unrealistic, to impute to the Congress an intention, in § 122 (b) (1) (B) of the 1939 Code, to make the loss carry-back dependent upon the mere form in which the reorganization is cast, * * *."

In our own Circuit in J. G. Dudley Company v. C.I.R., 298 F.2d 750, at 754 (1962), Judge Soper, in commenting upon *Newmarket,* stated:

"Therein the court reached the conclusion that the concern of Congress was not to bring stability to the tax burden of an artificial legal entity called a corporation but rather that of the human beings doing business behind the corporate facade.

"Subsequent decisions of the Courts of Appeals have understood the Libson decision to mean that the continuity of the same business rather than the continuity of the same corporate structure is the test of the right of a taxpayer to deduct losses incurred in a previous year."

In the present cases there was a continuity of ownership of the constituent corporations both prior to the merger and in the succeeding years. Barge and Fuel, as wholly owned subsidiaries of Amherst Coal, were owned by the same "human beings doing business behind the corporate facade" who in the final analysis sustained the premerger Hatfield losses.[2] I can perceive no good reason why they should be denied the benefit of a valid carry-over merely because for operating purposes Hatfield's assets were, in part, allocated to subsidiaries of Amherst Coal. The entire premerger Hatfield business which produced the losses was, in the aggregate, carried on in the postmerger years by the three Amherst corporations and, as so con-

2. We are not confronted here with an attempt to offset premerger losses of one business against postmerger profits of some other business operated and taxed separately prior thereto such as confronted the Court in *Libson* or in Julius Garfinckel & Co. v. C. I. R., 335 F.2d 744 (2nd Cir. 1964). Nor are we dealing with a "shell" situation such as those involved in J. G. Dudley Company v. C. I. R., supra, and Norden-Ketay Corporation v. C. I. R., 319 F.2d 902 (2nd Cir. 1963).

tinued, operated profitably. This being so, why should the finespun distinction be made that the Hatfield business was carried on by wholly owned corporate entities rather than "divisions" of Amherst Coal? [3]

The carry-over in these cases, if permitted, is not the windfall, warned of in *Libson* arising solely from the corporate reshuffle. Basically, it measures up to all of the criteria of *Libson* and its progeny, and should not be denied merely by reason of the form of the intercompany reorganization. The realistic and common sense basis for this conclusion is found in the final observation of the Court in F. C. Donovan, Inc. v. United States, supra, 261 F.2d at 476:

"We now think that the true explanation of New Colonial Ice Co., Inc. v. Helvering is that it came up under the provisions of the Revenue Act of 1921, which was several years before the Congress introduced into the revenue laws the broad provisions for certain types of reorganizations to be tax-free as to the corporations. It was the obvious and stated purpose of the Congress to encourage businessmen to effectuate certain types of tax-free reorganizations for adequate business reasons, unaffected by a fear of adverse federal tax consequences. See Comment (2) to § 203 of the Revenue Act of 1924 in H.R.Rep.No.179, 68th Cong., 1st Sess. * * * If we should hold, in the present case, that the effectuation of such a reorganization has resulted in cutting out a carryback privilege which otherwise existed, we would be defeating the essential purposes of the Congress in enacting the provisions for tax-free reorganizations."

While I am of the opinion that Amherst Coal Company, as successor to Hatfield by statutory merger, and as parent company in the Amherst complex, qualifies as "the taxpayer" entitled to carry over and deduct Hatfield's operating loss, I am further of the opinion that, in view of the facts and records involved in these cases, a more satisfactory and orderly disposition of this phase of this litigation will be accomplished by allocating the carry-over to Amherst Coal, Amherst Barge and Amherst Fuel in proportion to the income derived by each from the continuation of the Hatfield business.

### Postmerger Income Question

Amherst Coal and its subsidiaries operated profitably in the postmerger years of 1953 through 1956. Amherst Coal itself realized a net taxable income for this period in the amount of $3,084,-635.49. Campbells Creek Railroad Company, which had lost $52,121.22 in 1950 as a Hatfield subsidiary, realized a net taxable profit of $111,554.24 during the 1953–1956 period as an Amherst subsidiary. The Railroad's 1950 net operating loss was used by it to offset income earned in 1951 and subsequent years. Amherst Barge (now Amherst Industries) had a net taxable income during the 1953–1956 period aggregating $242,-670.68, and Amherst Fuel realized a net income of $663,365.74 during this same period. As heretofore set out in the findings of fact, it has been stipulated that Amherst Coal, Amherst Barge and Amherst Fuel each realized income during the postmerger years which income

3. Indeed, for accounting purposes compatible with Rev.Rul. 59–395, C.B. 1959–2, supra, the continuation of the basic categories of Hatfield's premerger business within the structure of the three Amherst corporations has much to commend it. In this context Judge Friendly observed in Julius Garfinckel & Co. v. C. I. R., supra, 335 F.2d at 748:
"The years have indeed revealed that the test of a continuing 'business' entity creates at least as many problems as the more arbitrary but more certain one that had preceded it—in addition to the basic incongruity of forcing a merged corporation, during the period of a potential loss carry-over, to keep asunder what the merger was supposed to have joined, with the accounting problems that may attend upon this."

was attributable to the continuation of a business formerly conducted by Hatfield. In summary, this stipulated postmerger income is as follows:

| | 1953 | 1954 | 1955 | 1956 | Total |
|---|---|---|---|---|---|
| Amherst Coal Co. | 52,761.21 | 38,730.79 | 38,902.07 | 33,830.97 | 164,225.04 |
| Amherst Barge Co. | 57,314.10 | 23,179.69 | 59,220.96 | 50,090.21 | 189,804.96 |
| Amherst Fuel Co. | 57,283.65 | 41,916.16 | 48,637.77 | 74,051.59 | 221,889.17 |
| | 167,358.96 | 103,826.64 | 146,760.80 | 157,972.77 | 575,919.17 |

There is no dispute as to any additional items of income or loss relative to the postmerger profits realized by Amherst Fuel and Amherst Barge by the utilization of Hatfield assets. Accordingly if, after a subsequent review of the claimed loss and income items allegedly attributable to Hatfield assets held by Amherst Coal during the postmerger years in question, a net postmerger profit is available against which the Hatfield losses may be applied, the maximum amounts of carry-over to be allowed Amherst Fuel and Amherst Barge will be limited to the amounts set forth in the stipulation. It follows, therefore, that all disputed questions of loss or income items during the postmerger years will relate to the Hatfield assets used, or allegedly used, in the activities of Amherst Coal.

The specific items of income or loss for the period 1953–1956 which are at issue here are as follows:

(1) Dana Shaft Mine (formerly Point Lick Mine) 224,243.31
(2) Winifrede Seam Loss (15,054.45)
(3) Putney Mine Loss (49,182.14)
(4) Interest Income 47,892.73
(5) Income Logan County Coal through Baymiller Street 143,004.68
(6) Dana Slope Mine Loss (1,213,087.89)
(7) 1955–56 Expenses 1,014 Acre Tract (23,913.82)

*(1) Dana Shaft Mine*

Based upon the stipulation and the evidence, the findings in regard to this item are as follows:

(a) The principal Hatfield mining operation as of the date of merger, December 31, 1952, was its Point Lick mine situate on Point Lick Branch of Campbells Creek, Kanawha County, West Virginia. The name of this mine was changed after merger to the Dana Shaft mine.

(b) This deep shaft mine was opened in 1926 on a 4,954.7 acre tract (5,000 acre tract) of land owned in fee by Hatfield and worked the No. 2 Gas seam of coal. In 1944, Hatfield leased from Kanawha & Hocking Coal and Coke Company the No. 2 Gas seam of coal underlying a tract of land comprising 1014 acres (1014 acre tract) adjoining the Shaft mine fee tract. Thereafter, Hatfield and its successor by merger, Amherst, mined coal through the Shaft mine from both the fee tract and the 1014 acre leasehold. The production of this mine moved in the domestic and industrial steam coal markets.

(c) The Point Lick shaft mine was Hatfield's principal mine in 1950, when Amherst and Logan County acquired control. The mine was believed to possess a substantial life in 1950, and its reserves were thought to be adequate for the size mine and expenditures which Hatfield had previously made.

(d) The Point Lick mine lost $559,-986.65 in 1950, a loss in excess of the overall Hatfield loss of $536,127.39 for that year. In 1951, this mine's operating loss was $270,065.49, and the overall loss for the year was $305,593.28.

(e) Mining operations in the 1014 acre tract through the Shaft mine ceased in December, 1954. Mining operations in

the fee tract ceased in July, 1956, and the Point Lick (Dana) Shaft mine was closed.

(f) In operating the Point Lick (Dana) Shaft mine during the years 1953–1956, Amherst derived income from the continuation of a premerger Hatfield business. The income derived from the Point Lick (Dana) Shaft mine has been stipulated for the years 1953–1956, inclusive, to be $224,243.31.

■ Unquestionably, the operation of this mine by Amherst Coal represented the continuation of a primary part of the premerger Hatfield business, and indeed the stipulation agreed to by the government would seem to concede this point. As heretofore pointed out, Hatfield had expended substantial sums of money in the years shortly prior to the merger designed to increase the productivity of the mine, and the postmerger income quite probably to a large degree was the result of the premerger improvements. It is my conclusion that Amherst Coal is entitled to the advantage of this postmerger income in the stipulated amount of $224,243.31.

### (2) Winifrede Seam Loss

■ The plaintiff in its brief admits that the loss stipulated as attributable to this item should properly be considered as a loss incident to the continuation of a premerger Hatfield business. Understandably, the government takes no exception to this concession by the plaintiff and this loss in the stipulated amount of $15,054.45 should be deducted from the postmerger income.

### (3) Putney Mine Loss

An admission similar to that made by the plaintiff in regard to Item (2) is also made with respect to this Putney mine loss, and again the government has taken no exception thereto. Accordingly, the stipulated loss of $49,182.14 should be deducted from the postmerger income.

### (4) Interest Income

In regard to this item the plaintiff alleges as follows:

(a) That during the postmerger years here in question the Hatfield business and assets produced the following average yearly additions to the working capital funds of Amherst Coal Company:

| Year | Amount |
| --- | --- |
| 1953 | $258,004.15 |
| 1954 | 482,560.25 |
| 1955 | 655,481.52 |
| 1956 | 810,004.16 |

These figures represent average yearly cumulative totals, and in fact the aggregate of the funds derived from the use of Hatfield assets for the four-year period ending December 31, 1956, amounted to only $883,841.33.

(b) That during the years 1953–1956, Amherst's cash position decreased by approximately $100,000, and during the same period its investment in Treasury obligations increased by $1,600,000. Amherst Treasurer, W. F. Miller, testified that the source of funds for these Treasury obligations was derived from the increases in working capital and that the average interest yield during the period in question was two percent.

(c) Based upon the investment practices, records of investments and yields, and books of account, Miller testified that no less than $47,892.73 of Amherst's interest income during the years 1953–1956 was derived from Hatfield assets.

The plaintiff admits that working capital funds or cash by their very nature wear no distinctive corporate label. It does assert, however, that its analysis of the source and application of funds supports its contention that the claimed amount of interest income resulted from the increase in working capital provided by Hatfield assets.

The government points out that working capital is merely the difference between current assets and current liabilities, and current assets are not only cash, but include a variety of items, such as accounts receivable, inventory, prepaid expenses, etc. Thus, a source and application of funds statement does not realistically demonstrate the cash flow in a

business. The government further points out that Treasury bonds, of course, can be purchased only with cash available to the corporation, and contends that the records and schedules upon which Amherst relies failed to establish the amount of cash produced by the continuation of the Hatfield business that was available at any particular time for investment in Treasury bonds.

■ With respect to this item, I am inclined to agree with the position of the government. Even though it might be reasonable to assume that the Hatfield business did produce working capital available for use by Amherst in regard to its bond investments in the postmerger years, any finding on this point would necessarily rest on speculation and conjecture. Accordingly, it is my conclusion that the plaintiff has failed to sustain the burden of proof on this item and the claim of interest income in the amount of $47,892.73 should be disallowed in computing the postmerger income of Amherst attributable to a continuation of the Hatfield business.

### (5) Income Logan County Coal Through Baymiller Street

In regard to this item, Amherst Coal points out that prior to the acquisition of Hatfield, it had great difficulty in selling its Logan County coal in the Cincinnati market due to the fact that its principal competitors had loading and yard facilities in that market. Amherst points out that possession of such facilities was essential to any Logan producer to place him in a competitive position in the Cincinnati market. The plaintiff further points out that following the merger and during the years 1953–1956, inclusive, Amherst sold 389,793.95 tons of coal produced from its Logan County mines and marketed through the Baymiller Street yard and derived the net profit after depletion of $143,004.68. This profit, Amherst contends, is properly attributable to the acquisition of the Hatfield marketing facilities and should be included in the postmerger income.

■ In my opinion Amherst's position is not well taken. Some amount of Logan County coal, though comparatively small, was sold by Amherst Coal through Baymiller Street prior to the merger. The income earned from the sale of this coal prior to the merger was attributable to Amherst and not to Hatfield. Acquisition of the Hatfield facility undoubtedly stimulated Amherst's coal sales business in the Cincinnati market, but it was nevertheless a continuation of the premerger Amherst Coal business that generated the income from such sales. This income is necessarily attributable to Amherst and is not properly includable in the postmerger income derived from a continuation of a business conducted by Hatfield. Accordingly, this item of $143,004.68 should be excluded from the postmerger computation.

### (6) Dana Slope Mine Loss

Based upon the stipulation, exhibits and evidence, the facts with respect to this item are found to be as follows:

(a) After the Hatfield merger, and in the early part of 1953, Amherst Coal Company commenced the development of a new mine known as the Dana Slope mine. A permit to open this new mine was requested by Amherst from the State Department of Mines on February 3, 1953 and received February 4, 1953. No expenditures were made to develop the Dana Slope Mine prior to 1953.

(b) The Dana Slope mine was developed by Amherst to mine and extract coal from the No. 2 Gas seam underlying a 1500 acre tract and a 1400 acre tract of land leased from Kanawha & Hocking. Development work continued until September, 1954, when production of coal commenced. The mine was closed and leases surrendered on March 31, 1960.

(c) These coal reserves for the Dana Slope mine were acquired by lease from Kanawha & Hocking, as follows:

1. The 1500 acre lease had been acquired in November, 1951 as a reserve for the Dana Shaft (Point Lick) mine. The lease was acquired in the name of

Hatfield but only upon Amherst and Logan County's guarantee. Because of haulage and other difficulties, all plans to mine this coal through the Shaft mine were abandoned by the end of 1952, prior to merger, and no coal from the 1500 acre tract was ever mined through the Shaft mine.

2. Subsequent to the Hatfield merger, and on June 30, 1953, Amherst acquired an option to lease the No. 2 Gas coal underlying a 1400 acre tract of land adjoining the 1500 acre tract, and on December 15, 1953, exercised its option for the purpose of acquiring additional coal reserves for the new Dana Slope mine. The Slope mine extracted coal from both the 1500 acre and 1400 acre tracts.

3. Performance of the November, 1951 lease of 1500 acres by Hatfield was jointly and severally unconditionally guaranteed by Amherst and Logan County. Kanawha & Hocking would not enter into a lease with Hatfield unless Amherst and Logan County guaranteed performance of the lease. This guarantee was insisted upon because Kanawha & Hocking felt that Hatfield did not have the stability or financial background to warrant the making of a lease of this type with it.

(d) The Dana Slope mine opening was located in Hunt Hollow at the mouth of the Left Fork of Witchers Creek at a point where the coal was closest to the surface. At no point on the leasehold did the No. 2 Gas seam outcrop. The Dana Slope mine was approximately

three land miles from the Shaft mine. The coal seam was approximately 181 to 200 feet below the surface at the point of entrance. The mine was operated entirely separately from the Shaft mine, and had its own supply houses, ventilating system and power system. By letters dated September 18, 1954 and addressed to the U. S. Bureau of Mines and West Virginia Department of Mines Mr. H. E. Jones, Jr. advised:

"Effective September 13, 1954, the new Dana Slope mine of the Amherst Coal Company started production of coal. The Dana Slope mine is a new mine in all respects and should not be confused with the old Dana mine now being operated by Amherst Coal Company at Rensford, West Virginia.

\* \* \* \* \* \*

" \* \* \* Since this mine is new and separate from the old Dana mine, it should be shown as such in the Bureau of Mines (State) records and should be inspected separately from the Dana mine."

(e) Prior to the opening of the new mine, on August 30, 1954, Mr. W. F. Miller, Amherst's Treasurer, ordered the preparation of separate daily cost sheets for the Dana Slope mine. Separate cost records for labor and supplies were kept for all of Amherst's large mines, including the Dana Slope mine.

(f) To develop and equip the Dana Slope mine, Amherst Coal Company expended over one million dollars, as follows:

| | |
|---|---:|
| Development costs expensed | $ 491,817.56 |
| Development costs capitalized | 186,754.01 |
| Mining equipment | 394,435.90 |
| | $1,073,007.47 |

Additionally, it was Mr. Miller's opinion that the new mine required working capital funds to meet payroll and pay current operating expenses in sufficient amount to carry the mine for two months.

(g) The expenditure of over one million dollars to bring the Dana Slope mine into production was the largest expenditure ever made by Amherst Coal Company in opening a new mine. It was the first time that Amherst had been called

upon to provide all of the facilities for a new mine. It was necessary for Amherst to initiate this project in its entirety, including the stringing of power lines, building of roads, and driving of slopes and shafts. The mine was designed for production of 3000 tons per day, and was developed primarily to take advantage of the metallurgical and high grade industrial steam market.

(h) Mr. H. E. Jones, Jr., President of Amherst Coal, testified that extensive study preceded Amherst's decision to launch this project and as a result thereof concluded that there was a workable coal seam in sufficient reserve available to justify the substantial expenditure; that Amherst Coal Company had the necessary capital for the project and believed that it had a favorable market for the proposed production.

(i) Mr. Charles T. Jones, President of Amherst Fuel Company, participated in the decision to go forward with the Dana Slope mine, his participation being directed primarily to the area of the marketing of the coal. Hatfield had never sold coal on the metallurgical market, and its production from the Dana Shaft mine had gone on the Cincinnati industrial market and the domestic market. Approximately 60 percent of the Shaft mine production went on the domestic market and the remaining 40 percent went on the industrial market. At the time consideration was being given to the Slope mine, the domestic market was declining at the rate of about six percent a year. While the Cincinnati steam market continued rather stable, Amherst's management concluded that it was advisable to turn to the metallurgical market as an outlet for the larger size coal which was gradually losing its marketability in the diminishing domestic field. But for the belief that Amherst could place the Dana Slope mine production on the metallurgical market, it would not have opened the mine. While Hatfield had never entered the metallurgical market, Amherst had for many years sold a portion of its production to the metallurgical consumers. It knew that No. 2 Gas coal from adjacent properties was suitable for metallurgical use and concluded that conditions for the production of consistent quality coal for the metallurgical market would be more favorable and economical through the Slope mine than in the old Shaft mine.

(j) It has been stipulated that the net loss of the Dana Slope mine for the years 1953–1956, inclusive, is $1,213,087.89.

(k) The 1953 and 1954 Slope mine losses include mine development expenses which Amherst elected to deduct in the amount of $400,964.99 in 1953 and $90,852.57 (these amounts include road expenses of $120,826.18 in 1953 and $21,392.28 in 1954 at issue in this case) pursuant to Section 23(cc) of the 1939 Internal Revenue Code and Section 616 of the 1954 Internal Revenue Code.

(l) The principal cause of the Slope mine losses and its ultimate closing in 1960 were (1) the failure to place the mine's production on the metallurgical market, and (2) unanticipated mining conditions and imperfections in the coal seam not disclosed by prospecting.

(m) From the time acquired and prior to the merger, Hatfield possessed a poor financial rating. In October, 1950, Amherst and Logan County each loaned Hatfield $100,000. Prior to merger each had loaned Hatfield $400,000. In June, 1951, a Cincinnati bank called a Hatfield loan of $218,000 because Hatfield's working capital had dropped below the amount stipulated in the loan agreement, and Hatfield did not enjoy a sound credit rating at the time of the merger. Kanawha & Hocking refused to lease land to Hatfield in November, 1951, without a written unconditional guarantee of lease performance by Amherst and Logan County, due to the fact that Hatfield lacked the desired stability or financial background.

 This, like the other items of postmerger income or loss, presents a factual issue, and in the light of the evidence it is my conclusion that the loss incident to this ill-fated venture was attributable solely to Amherst Coal, and did not result from the continuation of

a business formerly conducted by Hatfield.

The development of the mine was commenced subsequent to the merger, and production did not start until September, 1954. There was no physical connection between the Slope mine and the old Shaft mine, and the evidence clearly shows that it was a new project which was separate and distinct from the premerger Hatfield operations. Hatfield could not have developed the mine for it had neither the necessary capital resources for the project, nor the credit standing to borrow the funds from commercial sources.

The government argues that the Slope mine was designed as a substitute for or continuation of the Shaft mine and states in its brief that Amherst began development of the Slope mine partly on the 5000 acre fee tract and partly on the 1014 acre leasehold tract for the purpose of extracting coal reserves from the latter tract as well as the 1500 acre tract. In so stating, counsel for the government have, in my opinion, misread the record. Only the mouth of the Slope mine was located on the fee property, and the mine was designed to extract coal not from the 1014 acres, but from the seam underlying the 1400 acre leasehold acquired by Amherst in 1953 and the 1500 acre tract which had never, in fact, been mined by Hatfield. The 1014 acre tract was never seriously considered as a reserve for the Slope mine, and no coal was ever taken from it through the Slope operation. Finally, the Slope mine was developed to supply an anticipated metallurgical market; a market which Hatfield had never at any time attempted to enter or exploit.

In summary: (1) the Slope mine was not acquired from Hatfield by merger, but was developed in its entirety subsequent thereto; (2) Amherst alone provided the prospecting studies, development planning and engineering for the Slope mine as well as the necessary capital funds, all subsequent to the mer-

ger; (3) Amherst obtained the coal reserves for the mine, 1400 acres directly by lease from Kanawha & Hocking in December, 1953, and 1500 acres indirectly by the guarantee of the Hatfield lease from Kanawha & Hocking in 1951;[4] and (4) Amherst developed the prospective metallurgical markets for the Slope mine production.

As initially stated, the preponderance of the evidence clearly demonstrates that the Slope mine was a postmerger Amherst project, and was not, in any sense, the continuation of a business formerly conducted by Hatfield.

### (7) 1955–1956 Expenses—1014 Acre Tract

█ It has been stipulated that expenses of $4411.97 in 1955 and $19,501.85 in 1956 are attributable to the 1014 acre tract. As heretofore stated, this tract was leased by Hatfield from Kanawha & Hocking in 1944 and was part of the Dana Shaft mine until that operation was closed in December, 1954, pursuant to the federal mine closure order. While neither party has argued the issue of these items to any substantial degree, it is my conclusion that these expenses should be applied against postmerger income derived from Hatfield assets.

This tract was an integral part of the Shaft mine operation, and the evidence and findings relative to the Lost Coal Issue, infra, clearly indicate that any "hope" of recovery from this tract through the Dana Slope mine was highly speculative and, in fact, was never seriously considered by Amherst in the Slope mine development. Accordingly, these expenses should properly be charged against income derived in the respective years from the continuation of the premerger business of Hatfield.

### Summary

Based on the foregoing findings and conclusions relative to the respective

---

4. As pointed out in the factual findings, although this lease was acquired by Hatfield, because of Hatfield's poor financial standing the lessor, Kanawha & Hocking, was unwilling to enter into the lease except upon the joint and several guarantee of performance thereof by Amherst Coal and Logan County.

items, the postmerger income or losses of the Amherst companies attributable to a business formerly conducted by Hatfield are summarized as follows:

## POSTMERGER AMHERST–HATFIELD INCOME

### Amherst Coal Company

| | 1953 | 1954 | 1955 | 1956 | Total |
|---|---|---|---|---|---|
| Stipulated Hatfield Income | $ 52,761.21 | $ 38,730.79 | $ 38,902.07 | $ 33,830.97 | $ 164,225.04 |
| Dana Shaft Mine | 151,815.79 | (34,031.43) | 65,334.53 | 41,124.42 | 224,243.31 |
| Winifrede Seam | N/A | (4,774.05) | (4,411.97) | (5,868.43) | (15,054.45) |
| Putney Mine | (14,303.68) | (12,144.49) | (11,236.64) | (11,497.33) | (49,182.14) |
| 1014 Acre Tract | N/A | N/A | (4,411.97) | (19,501.85) | (23,913.82) |
| Total A.C.C. | $ 190,273.32 | ($ 12,219.18) | $ 84,176.02 | $ 38,087.78 | $ 300,317.94 |

### Amherst Fuel Company

| | 1953 | 1954 | 1955 | 1956 | Total |
|---|---|---|---|---|---|
| Total Stipulated | $ 57,283.65 | $ 41,916.16 | $ 48,637.77 | $ 74,051.59 | $ 221,889.17 |

### Amherst Barge Company (Industries)

| | 1953 | 1954 | 1955 | 1956 | Total |
|---|---|---|---|---|---|
| Total Stipulated | $ 57,314.10 | $ 23,179.69 | $ 59,220.96 | $ 50,090.21 | $ 189,804.96 |
| Total Amherst Complex | $ 304,871.07 | $ 52,876.67 | $192,034.75 | $162,229.58 | $ 712,012.07 |

## II

## MINE ACCESS ROADS ISSUE

### Dana Slope Mine

On this issue I find the relevant facts to be as follows:

(1) In its 1953 and 1954 federal income tax returns, Amherst Coal Company elected to deduct under Section 23 (cc) of the 1939 Code and Section 616 of the 1954 Code, as mine development expense of its Dana Slope mine, road construction costs amounting to $120,826.-18 for the year 1953 and $21,392.28 for 1954, aggregating $142,218.46.

(2) The Service disallowed deduction of the road cost of $142,218.46, and has allowed amortization of the cost at the rate of 10 percent per year starting September, 1954.

(3) Development of the Dana Slope mine commenced in 1953; the mine commenced production in September, 1954, and was closed in March, 1960, at which time the mine leases were surrendered and the road abandoned. The mine was in the development stage until 1956.

(4) The Dana Slope mine served a 2900 acre tract of virgin No. 2 Gas coal leased from Kanawha & Hocking Coal & Coke Company. The Slope opening was located on Witchers Creek, about three miles distant from the nearest public road and railroad, both located at Rensford, West Virginia, the location of Amherst's existing shaft mine and preparation plant.

(5) To drive the new slope and develop the working it was necessary to build an access road from Rensford to the site of the new slope. The road was located partly on fee land and partly on leased land and was about three miles long. It had no use or value apart from the mine which it served.

(6) The road was necessary to gain access to the slope for the men, supplies and equipment, not only to drive the slope and develop the working, but throughout the development and production stage. It also served as a means of

egress for the coal. It was expected that the road would have a useful life equal to the life of the mine which it served.

### Lundale No. 2 (Dorothy) Mine

(1) The Lundale No. 2 (Dorothy) mine is located on lands leased from the Pardee Land Company in the vicinity of Lundale, Logan County, West Virginia, in which vicinity plaintiff has operated mines for many years. The preparation plant serving this mine is located at Amherstdale, about six miles distant.

(2) The Lundale No. 2 mine works the upper Chilton seam of coal which is found at an average elevation of 2280 feet above sea level. Plaintiff built a road two miles up Dingess Branch to the mine portal. The road started at an elevation of 1350 feet. Prior to its construction no road existed by which the mine portal could have been reached The road has no hard surface or binder but is graded, drained and surfaced with red dog. It is located entirely on leased land.

(3) The Company elected to deduct as mine development expense the following road construction costs in its 1956, 1957 and 1958 federal income tax returns: $37,370.87 in 1956; $89,969.07 in 1957; $3,761.30 in 1958, aggregating $131,101.-24.

(4) Because of adverse conditions in the coal market the mine did not commence production until September, 1959, and then only on a limited scale. The mine did not reach the production stage until about 1962.

(5) The Service disallowed deduction of the road cost of $131,101.24 and has allowed amortization of the cost at the rate of 10 percent per year starting October, 1958.

(6) The Lundale mine road ran from the nearest public road and rail point located at the mouth of Dingess Branch to the mine. Construction of a road was necessary to gain access to the drift opening of the mine for men, supplies and equipment. Apart from coal haulage, this mine road has essentially the

same uses as the Dana Slope mine road. It has no use or value apart from the mine which it serves.

(7) Up to the time of trial, September, 1963, this road had been used to haul coal by truck downhill to a ramp where it was loaded into railway cars and transported to the Amherstdale preparation plant. The road was not built to serve as a permanent haulage road, and it would cost an additional 15 to 20 percent to make it such. At the time of trial other haulage methods were under active consideration.

The applicable Code sections (Section 23(cc) of the 1939 Code, now Section 616 of the 1954 Code, supplemented by Section 309(a) of the Revenue Act of 1951) allows the deduction of "all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well)." At the taxpayer's election, the cost may be treated as a deferred expense. These sections further provide that it does not apply to the expenditures for the acquisition or improvement of property of a character which is subject to the allowance for depreciation.

The questions to be determined in order to decide this issue are: (1) Are these expenses "development expenses" within the meaning of the statute; (2) if they are "development expenses," do they lose their deductible status because they may benefit the production stage of the mine; and (3) are the roads depreciable or depletable mine improvements?

Plaintiff, of course, contends that these costs are development expenses within the meaning of the statute; that the roads constructed are depletable mine improvements, and that the fact they may be used during the production stage of the mine does not effect the loss of their deductible status. Defendant's basic contentions are directly contrary to those of the plaintiff.

In regard to the first question, I am of the opinion that the expenditures in construction of these access roads were mine development expenses within the meaning of the statute. As was stated in Santa Fe Pacific R. R. Co. v. United States, 378 F.2d 72 (7th Cir. 1967), a recent case which dealt with what constitutes development of a mine: " * * * the statute [Section 23(cc)] does not purport to define 'development' at all. Under such circumstances it is proper, even necessary, to attribute the same meaning to the term as is generally ascribed to it by those whose activities the statute was designed to cover." The Court went on to state that "As the district court found, the development of a mine or deposit is commonly understood by authorities in the mining field to mean the activity necessary to make a deposit accessible for mining."

In the present case, it is apparent to the Court that both of these roads were necessary to allow access to the mine openings. They were, in the words of the above cited case, " * * * activity necessary to make a deposit accessible for mining." Accordingly, the expenses incurred in their construction were development expenses, within the meaning of the statute. Testimony of expert witnesses at the trial relative to this question further substantiate this finding.

As stated, the second question for consideration in regard to these expenditures is whether they lose their deductible status because they may benefit the production stage? Relative to this question, it should be pointed out that only the access road built in the development of the Slope mine was planned for use throughout the production stage. The access road built in the development of the Lundale No. 2 mine was not built to serve as a permanent haulage road. It was anticipated that other haulage methods would later be developed and used at Lundale No. 2.

Defendant seems to contend that the expense of building a temporary road, useable only during the "development stage" of the mine, is properly deductible, but that if a more permanent road is built, i. e., one that can also be used during the "production stage," its cost

is no longer a "development expense" and must be amortized. The Court agrees with plaintiff that this is an economically wasteful position.

The Court also agrees with plaintiff's contention that merely because a road which is necessary to drive a slope, drift, or shaft to gain access to the coal during the development stage is also useful during the production stage as a means of ingress and egress for men, supplies and coal does not deprive it of its status as a development expense. In this respect the road is analogous to the slope, air shaft, or drill hole. The roads here in question, once the production stage was reached, were merely an extension of the underground roadways, such as the vertical hole in a shaft mine, the slope or tunnel in other deep mining, or surface roadways in the case of an open pit mine. Construction costs of underground haulways do not lose their status as development costs simply because the haulways are thereafter used in the production stage. Indeed, that is a major purpose of their construction. Merely because the haulways are normally underground does not mean that similar facilities above ground should not be treated in a like manner.

The third question involved in determining this issue relates to whether or not the roads constructed are "depletable" or "depreciable" mine improvements. Under the applicable tax statutes, cited above, it is provided that "This section shall not apply to expenditures for the acquisition or improvement of property of a character which is subject to the allowance for depreciation provided in section 167 * * *." It is apparent that a determination must therefore be made as to whether the development roads of concern here are depletable or depreciable mine improvements. If they are depreciable improvements, they come within the above set forth exception and would not be deductible as mine development expenditures under the statute. On the other hand, if they are depletable improvements, the section applies to them, and plaintiff would be entitled to elect to deduct them in full as mine development expenditures.

The government has cited several cases which hold that roads and streets are capital improvements and that expenditures for their construction are therefore depreciable. See Clinton Cotton Mills, Inc. v. Commissioner, 78 F.2d 292 (4th Cir. 1935). As a general proposition this is true, but in the context of the question presented here this general and abstract observation is inapposite. Our question is whether these particular roads, constructed during the course of the development of these mines, and having no independent useful life apart from the mines, are depreciable or depletable improvements.

Plaintiff emphasizes certain intangible drilling regulations in its argument that Congress intended, when it granted the mining industry the right to deduct development expenses, to permit deductions for road construction such as is present in this instance. These intangible drilling regulations were approved by joint Congressional Resolution in 1945; H.R.Con.Res.No. 50, 79th Cong. 1st Sess. (1945); and the Commissioner was directed by statute to issue like regulations under the 1954 Code (Section 263(c), Int.Rev.Code 1954). Although these regulations apply to oil and gas expenditures, plaintiff submits that the Revenue Act of 1951, which provided for the deduction at the taxpayer's option of mine development expenses, was enacted for the express purpose of making the percentage depletion allowance more meaningful to the mining industry and according it equal treatment with that accorded the oil and gas industry by Treasury Regulation. Citing H.Rep.No. 586, 82nd Cong., 1st Sess. (1951), 1951–2 Cum.Bull. 357, 379; S.Rep.No. 781, 82nd Cong. 1st Sess. (1951), 1951–2 Cum.Bull. 458, 489.

The intangible drilling regulations to which Congress referred, and to which plaintiff refers here, construe depletable

expenditures broadly in the case of oil and gas, and place a relatively narrow construction on depreciable expenditures. These regulations, 1939 I.R.C. Treasury Regulation 118, Section 39.23(m)–16(a)(1), include "road making" in the category of intangible drilling and development costs and state that the option to expense, in general, "applies only to expenditures for those drilling and developing items which in themselves do not have a salvage value." Plaintiff submits that in the light of the Congressional intent to give the mining industry comparable benefits to those extended to the oil and gas industry, depletable mine development costs should not be construed more narrowly in the case of coal than in the case of oil and gas.

■ It is recognized that the distinction between "depletion" and "depreciation" as applied to land improvements is a narrow one. See United States v. Ludey, 274 U.S. 295, 47 S.Ct. 608, 71 L.Ed. 1054 (1927); Burnet v. Petroleum Exploration, 61 F.2d 273 (4th Cir. 1932), aff'd 288 U.S. 467, 53 S.Ct. 439, 77 L.Ed. 898 (1933). In *Burnet*, the Fourth Circuit pointed out that a drill hole, as in an oil or gas well, is not a physical property like a machine. Its function is similar to that of a mine shaft or tunnel. It has no independent life or value apart from the mineral deposit. As a result, although both depletion and depreciation are methods of capital recovery, the general basis for distinction between them is whether, in addition to being necessary to the development of the mineral property, the improvement has an independent physical life of its own with a resultant salvage value, or whether its useful life is limited by the mineral deposit it serves. This appears to be the distinction employed in classifying intangible drilling and development costs in the regulations cited above, and has been upheld by the courts. United States v. Dakota-Montana Oil Co., 288 U.S. 459, 53 S.Ct. 435, 77 L.Ed. 893 (1933); Burnet v. Petroleum Exploration, supra.

■ Plaintiff submits this to be a logical and meaningful test for classification of mine improvements, and I am persuaded that its position on this point is a sound one. These access roads were of value only so long as the mines continued to operate. They had no salvage value upon termination of the mining operation. Accordingly, I conclude that the access roads are depletable assets, subject to the election permitted for development expenditures, and do not fall within the Code exception relative to depreciable assets.

## III

### THE DILLON SETTLEMENT ISSUE

The facts on this issue, largely undisputed, are found to be as follows:

(1) By written contract of sale dated March 27, 1948, Amherst Fuel Company, as agent for Logan County (later Amherst Coal Company by change of name), sold to J. H. Dillon, d/b/a J. H. Dillon Coal Company ("Dillon"), 150,000 tons of coal annually for a period of three years beginning April 1, 1948, and ending March 31, 1951. This coal was to be delivered at the rate of approximately 12,500 tons per month during this period at a price of $5.25 per ton net to Amherst Fuel Company and its principal. The purchase price was distributable between them on the basis of 25 cents per ton to the agent and the balance to the principal. The sale contract specified that the coal should be from the Paragon-McGregor No. 6 mines of Logan County.

(2) Partial deliveries under this agreement were accepted through July, 1950, and thereafter Dillon refused to accept any further deliveries. Amherst shipped 177,046.95 tons of coal under the agreement and Dillon refused 272,-953.05 tons, less 48,663.29 tons excused because of strikes and other causes.

(3) The production at the mine in question in each of the three contract years was more than double the tonnage deliverable under the contract in each of such years.

(4) Throughout the contract term Amherst had available sufficient tonnage produced from the Paragon Mine, uncommitted elsewhere, to fulfill the Dillon contract. The production from the mine not applied on the Dillon purchase was sold elsewhere. On May 7, 1952, the Amherst companies brought suit against Dillon in the Circuit Court of Kanawha County to recover damages for Dillon's breach of the purchase contract. This suit was removed to the United States District Court for the Southern District of West Virginia, and thereafter on March 23, 1953, the suit was settled by agreement between the parties whereby Dillon paid the sum of $240,000. Out of this settlement $217,857.89 was distributed to Amherst Coal Company (the principal) and the balance to Amherst Fuel Company (the agent), being allocated between them in the same proportion as their respective claims against Dillon as set out in the suit.

(5) Amherst Coal Company reported this settlement amount in its 1953 federal income tax return as ordinary income. In the claim for refund which is the subject matter in this action, it is claimed that reporting this income in this manner was erroneous and that this error should be corrected by including the settlement amount received by the principal within its gross income from mining attributable to the Paragon-McGregor No. 6 mines, with allowance of percentage depletion in respect thereof.

(6) The Dillon contract was silent as to the method whereby the precise tonnage shipped in any given month and the precise dates of shipment would be determined. The parties during the course of early performance developed the practice of shipment in amounts and on dates as specified by Dillon through shipping instructions (referred to by the parties as releases) commonly given by Dillon not more than a week in advance of the specified shipping date.

(7) Because of the aforesaid shipping arrangements Amherst was required to constantly keep in mind its obligation under this contract when obtaining other orders for its production. Consequently the tonnage refused by Dillon was sold on the short term or spot market.

(8) Throughout the part of the contract period when Dillon refused to take any tonnage and the part of the period when the tonnage he took was unsubstantial, the spot market prices were substantially lower than the Dillon contract price.

Upon these facts the issue is whether the proceeds of the settlement of this action for breach of the coal purchase contract constituted "gross income from mining" for the purpose of computing the percentage depletion allowance.

There is a split of authority relative to whether or not a seller is required to hold himself available to perform an installment sales contract after a breach as to one or more installments, or whether he can rescind the remaining part of the contract. Plaintiff cites authority, J. W. Ellison, Son & Co. v. Flat Top Grocery Co., 69 W.Va. 380, 71 S.E. 391, 38 L.R.A.,N.S., 539 (1911), to the effect that West Virginia would follow what American Jurisprudence indicates may be a minority view on this point. 46 Am. Jur. Sales § 271 (1943). In the West Virginia case cited, the Court held that where a contract constitutes a present sale of chattels to be delivered in the future by installments, it is severable and a breach as to any one or more of the installments will not support a rescission as to the rest of the contract unless there is a clear and unequivocal renunciation of the remaining part of the contract.

In accord with this legal proposition, plaintiff submits that Amherst Coal, in order to avoid being guilty of a breach itself and to be in a position to hold Dillon responsible for his breaches, had to maintain a posture of readiness to fulfill its part of the bargain. As a result, Amherst Coal produced coal that Dillon was legally obligated to purchase, but refused to purchase. Amherst Coal then, as noted above, disposed of this coal at

a price less than the contract price. Plaintiff submits that the settlement represented the difference between the contract price and the price for which the coal was sold on the spot market, and therefore is a part of the sale price for the coal that Dillon was obligated to purchase.

The defendant does not contest plaintiff's position on the legal aspects of Amherst Coal's readiness to perform the installment sales contract. It basically relies upon the position that an allowance of plaintiff's contention relative to the settlement proceeds would violate the theory upon which percentage depletion is based. It cites as authority the case of Guthrie v. United States, 323 F.2d 142 (6th Cir. 1963), wherein the plaintiff was not allowed to treat proceeds from business interruption insurance as gross income from mining. In that case, processing equipment had been destroyed by fire, and plaintiff was paid under the insurance policy for profits lost due to the destruction of the processing facilities. Under the applicable statute, proceeds from processing are expressly included within the definition of gross income from mining. In *Guthrie,* however, processing was not performed, due to the fire, and the insurance proceeds were compensation for the *inability* to process the mineral.

Defendant also cites Crossett Timber and Development Co. v. C.I.R., 29 B.T.A. 705 (1934) and Estate of R. A. Lord, 9 P-H Tax Ct.Mem. 40, 146 (1940), both cases in which claims of depletion were disallowed. These cases are distinguishable, however, from the present case, in that in *Crossett* there was no actual depletion (as in the case at bar), and in *Lord* there was at most only theoretical depletion, and damages were paid for the failure to drill offset wells.

In addition, plaintiff cites a 1957 Senate Finance Committee report which referred to and explained the Congressional intent at that time, relative to the issue at bar. It stated:

"Subsection (b) of the new Section 1305 is *intended to make it clear* that for the purpose of computing credits and deductions for depletion * * * the *award is to have the same character as the income which would have been received* or accrued *except for the breach* of contract or duty." S. Rept.No. 836, 85th Cong., 1st Sess. (1957); 1957–2 Cum.Bull. 1074. (Emphasis added.)

Although this report was published subsequent to the settlement agreement, and applies to the 1954 Code, it does reflect some light upon Congressional intent and thinking on this question.

Defendant further contends that a distinction should be made on the basis that the proceeds paid to Amherst were the result of a settlement rather than a judical determination. This distinction is of no significance here, however. This was recognized in Nathan N. Ingber, 33 P-H Tax Ct.Mem. 64, 262 (1964), when the Court stated:

"The starting point in cases involving the taxability of amounts received as a result of litigation *or the settlement thereof,* is the question 'In lieu of what were the amounts paid under the settlement received?' Estate of Mabel K. Carter, 35 T.C. 326, 332 (1960), aff'd 298 F.2d 192 (C.A. 8, 1962), certiorari denied 370 U.S. 910, [82 S.Ct. 1257, 8 L.Ed.2d 404] (1962); Raytheon Production Corporation, 1 T.C. 952, 958 (1943), aff'd. 144 F.2d 110 * * * (C.A. 1, 1944) certiorari denied 323 U.S. 779, [65 S.Ct. 192, 89 L.Ed. 622] (1944)." (Emphasis added.)

 In the light of these observations, I am of the opinion that the plaintiff should prevail on this issue, and that the amount received by the taxpayer in settlement of the Dillon suit was in legal effect a part of the sale price for coal actually extracted. As such it was properly includable in Amherst Coal's "gross income from mining" for the purpose of computing the percentage depletion allowance.

Defendant submits that, even if the settlement is to be part of the depletion base, any legal expenses incurred in securing the settlement must be offset against the gross figure and that only the net proceeds should be included in determining the allowable deduction. It is stipulated that Amherst Coal deducted legal fees in connection with the Dillon suit of $28,154 in 1952 and $4,718 in 1953. The 1952 deduction for legal fees was not applied so as to reduce depletion in that year, whereas the 1953 legal fees deduction was so applied. The 1952 fees were, Amherst Coal admits, erroneously handled according to its theory of recovery, but it submits that that year is closed and not before the Court. In determining the depletion allowance, a taxpayer is allowed a percentage of "the gross income from the property during the taxable year" not to exceed "50 per centum of the net income" for that year. Int.Rev.Code of 1939, Section 114(b)(4). It is my conclusion that the 1952 legal fees should not be treated as expenses in determining "net income" for the year 1953 within the meaning of the cited Code section. Indeed, it appears from its post-trial brief that the government ceased to contest this latter issue, and it might be assumed that it elected to rest its position on the principal issue alone.

Since the 1953 legal fees were properly included so as to reduce the depletion otherwise allowable, the Court is of the opinion they were properly handled. The allowance for depletion under the settlement ($217,857.89) should be as stipulated, $107,948.58, subject to any adjustments which might be appropriate in order to conform to Section 114(b)(4), cited above.

IV

LOST COAL ISSUE

On this final issue, the facts are found to be as follows:

(1) Pursuant to an agreement dated September 7, 1955, Amherst Coal paid to its lessor, Kanawha & Hocking, the sum of $40,000 in satisfaction of a claim "that certain coal has been lost which was required to be mined" from a tract of 1014 acres of land in the No. 2 Gas seam at Amherst's Dana Shaft mine.

(2) The amount so paid was deducted in Amherst's 1955 federal income tax return as a "royalty" expense. The Revenue Agent's Report disallowed the deduction, stating "adjustment capitalizing claimed royalty expense at the Dana operations which the examiner maintains actually represents the purchase of coal in place."

(3) Kanawha & Hocking's lost coal claim arose when a federal mine closure order, issued in December, 1954, stopped further mining by Amherst in the 1014 acre tract. After receipt of this order, Amherst concluded that it would be uneconomical to rehabilitate this section of the Dana Shaft mine to federal standards. Accordingly, it abandoned the workings in the 1014 acre tract and withdrew therefrom leaving 35 barrier pillars containing approximately 450,000 tons of coal unmined.

(4) Kanawha & Hocking then asserted its claim in the amount of $72,000, based upon a lease royalty of 16 cents per ton multiplied by the estimated 450,000 tons of coal claimed to have been lost.

(5) By the agreement of September 7, 1955, this claim was compromised by the payment to Kanawha & Hocking of $40,000 in "full and complete satisfaction and release of all claims" by Kanawha & Hocking "with respect to 'lost coal'" and "all royalties thereon and arising therefrom." Amherst obtained "the right, subject to the terms and provisions of said lease, to mine" the barrier pillars "without further payment of royalty thereon." Except as above provided, the lease of November 5, 1951, continued and remained the same.

(6) At the time of the settlement agreement there was no hope of recovery of this coal through the Dana Shaft

mine. Entry into the 1014 acre tract could not have been made through areas mined out. Access could have been gained only through two fault areas where the coal had not been mined. Had this been possible, only part of the barrier pillars could have been recovered. While there was some hope that part of this coal might be recovered through the Slope mine, this was highly speculative, and the 1014 acre tract was never seriously considered as a reserve for the Dana Slope mine. In fact, none of this coal was ever mined, and even the speculative hope of recovery ended when the Slope mine was closed and the leases surrendered in 1960.

As heretofore stated, the issue is whether this $40,000 payment may be deducted as an ordinary and necessary business expense or an advanced royalty, as plaintiff maintains, or whether the payment was for the purchase of coal in place by Amherst Coal which must be capitalized.

Plaintiff contends that the payment is in the nature of an "advanced royalty" expressly deductible under Federal Tax Regulation 1.612–3(b) (3) (i), and cites two cases in support of this contention. Burnet v. Hutchinson Coal Co., 64 F.2d 275 (4th Cir. 1933) and Commissioner of Internal Revenue v. Jamison Coal & Coke Co., 67 F.2d 342 (3rd Cir. 1933). These cases held that a portion of an annual minimum royalty in excess of the production royalty did not have to be capitalized merely because the excess portion of the minimum royalty could be applied in satisfaction of production royalties in subsequent years to the extent that later production exceeded the minimum royalty in such years.

Judge Northcott, in *Burnet,* stated, that the conditions of recovery of the excess royalty were "too vague and indefinite to be considered in deciding questions of taxation." He went on to explain this conclusion in the following words (64 F.2d at 278):

"The contingencies that would defeat the recapture of any part of this excess payment are numerous. The lessee might make default in the terms of the lease, in which event the lessor could repossess the property and the taxpayer would lose the payment; conditions surrounding the coal industry might become such that the coal could not be sold for a price equal to the cost of production and the lease would necessarily have to be surrendered; the coal vein might 'pinch out'; fire might destroy the mine; labor troubles might prevent operation for a long period of time. In the event of the happening of any of these and many other contingencies the taxpayer could never recover any part of the excess payment."

Contingencies such as those pointed out by Judge Northcott did occur in the present case. It is clear that in making the payment to Kanawha & Hocking, Amherst was, in fact, primarily effecting a settlement of the lessor's claim for lost coal. Such settlements are not uncommon in the coal industry, and the fact that the settlement agreement gave Amherst the speculative and unrealistic right to mine the specific barrier pillars at some future time should the opportunity materialize is not, in my opinion, sufficient to convert the settlement of a potential lawsuit into the purchase of a capital asset. Accordingly, it is my conclusion that the payment in question was properly deductible by Amherst in 1955 as an ordinary and necessary business expense.

This opinion is being filed as my findings and conclusions on the several issues involved in this litigation, and counsel may prepare an appropriate judgment order incorporating this opinion by reference therein.