ROBERT W. HUGHES AND PATRICIA HUGHES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; FAY X. BYBEE AND EILEEN P. BYBEE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hughes v. Commissioner
Docket Nos. 17703-84; 4752-86
United States Tax Court
T.C. Memo 1989-528; 1989 Tax Ct. Memo LEXIS 528; 58 T.C.M. (CCH) 246; T.C.M. (RIA) 89528; September 27, 1989
Robert W. Hughes, for the petitioners. Thomas E. Crowe, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In these consolidated cases, respondent determined deficiencies, additions to tax, and additional interest *530 as follows: Additions to Tax and
Additional Interest
Sec.
Sec.
Sec.
Petitioners
Year
Deficiency
6653(a)(1)
6653(a)(2)
6621(c)
Robert W. Hughes and
1979
$ 4,565
--
--
--
and Patricia Hughes
1980
4,457  --
--
--
Docket No. 17703-84
Fay X. Bybee and
1981
$ 3,394
$ 170
* **
Eileen P. Bybee
*
Docket No. 4752-86 **
All section references are to the Internal Revenue Code, as amended and in effect for the years in issue. The parties stipulated at trial that, with regard to each docket number, there are four issues in dispute: (1) whether petitioners paid or incurred deductible mining development costs under section 616 in the amounts claimed for their respective taxable years; (2) whether petitioners were involved in the trade or business of mining during those years; (3) whether the mining activity in which petitioners were allegedly involved was entered into with a profit objective; and (4) whether petitioners *531 were at risk under section 465 for the entire amount of the losses claimed in the respective taxable years. The parties further agreed to be bound by this Court's determination of such issues in Bryant v. Commissioner, T.C. Memo. 1989-527, pursuant to the following terms: 5. The stated issues shall be resolved as if the Petitioners in this case were the same as the taxpayers in the CONTROLLING CASE [Bryant]; (a) If the Court finds that any additions to tax or the sec. 6621(c) interest are applicable to the underpayment attributable to the above designated tax shelter adjustment, the resolution of the tax shelter issue and the applicability of such additions to tax or interest to that tax shelter issue in the CONTROLLING CASE, shall apply to Petitioners as if the Petitioners in this case were the same as the taxpayers in the CONTROLLING CASE; (b) If any of the issues listed in paragraph 3 above are resolved favorably to the taxpayers in the CONTROLLING CASE, the Petitioners in Hughes and Bybee will be required to put on evidence of their alleged mining development expenses under I.R.C. sec. 616 for the years at issue; *532 (c) If any of the issues listed in paragraph 3 above are resolved against the taxpayers in the CONTROLLING CASE, then Petitioners in Hughes and Bybee will be bound by that negative determination as if the CONTROLLING CASE applied to the tax years at issue in the captioned cases. (d) If any of the issues listed in paragraph 3 above are not resolved or not reached by the Court in the CONTROLLING CASE, then Petitioners will bear the burden of going forward with proof on such issues in the instant consolidated cases. If Petitioners fail to adduce proof of any of such unresolved issues, then the parties stipulate that such issues will be resolved against Petitioners. (e) Petitioners will have until March 24, 1987, to conduct depositions in these cases for purposes of adducing proof in the event the issues involved are resolved favorably to them, or are not reached by the court, in the CONTROLLING CASE. Said depositions will be conducted at the offices of Las Vegas, District Counsel. Although the parties stipulated that petitioners would have approximately one month after trial to conduct depositions to adduce proof on any issue not reached in Bryant, no depositions *533 were ever made a part of the record. We cannot make findings of fact based on any such depositions. Petitioners Bybee
Petitioners Fay X. and Eilene P. Bybee resided in Glendale, California, when they filed their petition. In view of this Court's conclusions in Bryant, the stipulations set forth above dispose in large part of the case of petitioners Fay X. and Eileen P. Bybee. In Bryant, this Court decided that the taxpayers were not entitled to a mining development deduction with respect to their alleged mining activity on property known as the Summit Mine. This conclusion was based on the taxpayers' failure to prove that the Summit Mine venture had economic substance, i.e., that their transaction was not a sham. This negative determination is thus binding on petitioners Bybee, whose mining development deduction pertained to the same venture. Their deficiency was based entirely on respondent's disallowance of such deduction. The additions to tax under section 6653(a) and additional interest under section 6621(c) were not at issue in Bryant. Petitioners Bybee bear *534 the burden of proving that these sections do not apply. Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners failed to address these issues in their trial memorandum or post-trial briefs and are deemed to have abandoned them. Thus, we sustain respondent's determinations on these issues. Petitioners Hughes
Petitioners Robert W. and Patricia Hughes (petitioners) resided in Salt Lake City, Utah, when they filed their petition. In Bryant, this Court did not reach any of the issues set forth above with respect to the taxpayers' alleged mining activity on property known as the Tyro Mine. The Court did not have jurisdiction for the years in which the Bryants claimed mining development deductions regarding that mine. Because petitioners Robert W. and Patricia Hughes claimed deductions only in relation to the development of the Tyro Mine, we decide the issues enumerated above only in regard to their case. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. The parties also stipulated to incorporate the record of Bryant, including the transcript, stipulation of facts, and *535 accompanying exhibits, into the record of these cases. Background
The deductions in issue arise out of petitioner Robert W. Hughes' (Hughes) participation in the Equitable Gold Program (the Gold Program). The Gold Program was one of several mining ventures organized and promoted by the Equitable Corporation (Equitable), a Nevada corporation. Hughes' father, also Robert W. Hughes, was the president of Equitable during the years in issue. According to the offering memorandum for the Gold Program, the Gold Program entailed the development of mine property and the subsequent mining, milling, and refining of gold-bearing ore. Mining was to take place at the Tyro Mine, located near Bullhead City, Arizona. The Tyro Mine had been located several times, initially in the late 1860's. The first major mining work conducted at the mine occurred in 1902. Mining operations were renewed in 1939; however, the mine was shut down by law in 1941 due to World War II. The mine remained idle until late 1979, when Equitable organized the Gold Program. Each Gold Program participant, or "sublessee-miner," would sublease a mine tract in the Tyro Mine from Equitable and would contract with a *536 specified mining company for a minimum quantity of gold-bearing ore to be mined after the development of the mine. Gold produced from this ore, less certain royalties and fees equal to a fraction of the gold produced, would become the property of the participating sublessee-miner. The participant's only outlay -- an initial cash payment and a promissory note to Equitable for up to three times the initial cash payment -- was to be remitted to the mining company to finance the development of the mine. The offering memorandum indicated that the promissory note would be secured by the gold produced from the participant's tract. The offering memorandum touted anticipated tax advantages inuring to Gold Program participants. It promised among other tax benefits a first-year mining development expense deduction under section 616 equal to as much as four times the amount of the initial cash payment. Hughes, an attorney, furnished the tax opinion letter used in the offering memorandum. The offering memorandum also projected the economic profit potential in the Gold Program. According to the memorandum, any participant who paid, for example, a total of $ 20,000 in cash and notes toward *537 mine development costs would obtain rights to 2,500 tons of gold-bearing ore. Such ore, after royalties and costs, purportedly would produce a net profit to the participant of $ 32,050, as indicated below. The projection assumed that such ore would produce 0.12 ounces of gold per ton and that the minimum price of gold was $ 350 per ounce. Thus the projection was set forth as follows: 2,500 tons X 0.12 oz. per ton
300 oz. per ton
300 oz. at $ 350 per oz.
$ 105,000
Less 47 percent in total
royalties and costs to  mining company, lessor, and agent  (49,350)  Balance
$ 55,650 Less interest on note
8 percent X $ 15,000 X 3 years  (3,600)   Gross Profit
$ 52,050 Less Total Investment
(Cash and note)  20,000   Net Profit
$ 32,050 Attached to the offering memorandum was a geological report on the Tyro Mine by Frank H. Blair (Blair), dated November 19, 1979. Blair described in detail the geographical location of the mine, the means of access to the mine, the history of mining operations at the mine, and its geology. Blair concluded that there were over 600,000 tons of ore at the Tyro Mine bearing an average of 0.128 ounces *538 of gold and 0.314 ounces of silver per ton. Blair recommended allocating $ 914,500 to develop and mine the ore and an additional $ 1 million to purchase and install a 300-500 ton per day mill. Another geological report addressed to "The Equitable Plan," dated December 1979, was furnished by R.O. "Rocky" Camozzi (Camozzi). Camozzi provided geologic analyses and assay results of more than 400 samples taken from chip sampling and drilling investigations. Camozzi concluded: sampling program amply demonstrates the large commercial Tyro ore body existing. * * * Engineering studies to date indicate one million tons 0.09 oz. gold and 0.03 oz. silver from the assay reports. The price of refined gold soared during late 1979 and most of 1980. The market price in United States dollars during those years fluctuated as follows: June 1979
December 1979
June 1980
December 1980
$ 279
$ 455
$ 600
$ 594
Hughes' Transactions
Hughes allegedly acquired his first interest in the Tyro Mine on December 31, 1979. Hughes acquired a purported second interest in the Tyro Mine under the Gold Program through several instruments executed on December 31, 1980. The relevant *539 terms of those instruments, which included an agency agreement, a Mineral Claim Lease, a mining contract, a promissory note, and a check, are described below. Under the agency agreement, Hughes appointed Equitable as his agent to negotiate for gold recovery rights and to engage a mine operator to develop the leased mine property. The relevant duties imposed upon Equitable in the agency agreement were as follows: 1. Obtain a mineral sublease permitting developing and mining on Tract 364-4 for 2500 tons of gold bearing ore above the 2,573 foot level of the Tyro Gold Mine as described per the attached Mineral Claim Lease, Exhibit 2. 2. Arrange for an independent mining company to initially develop the subject mine property ready for mining the gold-bearing ore and to contract with said independent mining company to thereafter mine, mill, and refine the amount of gold provided in the Mineral Claim Lease, and deliver my cash and/or notes for development work for my lease mine property to contract mining company in the sum of $ 20,000 (cash and notes). 3. Obtain my share of gold bullion produced from the independent mining company as produced and remit same to me *540 in kind or cash as I direct, once you advise me of gold production, for a management fee of 2% of the value of gold produced. 4. Endorse and cash checks made out to the undersigned received from the proceeds of a loan or the sale of gold ordered by the undersigned to satisfy and comply with the terms of my Mineral Claim Lease, notes or loans. Under the Mineral Claim Lease, Hughes, as sublessee/miner, obtained from Equitable, as sublessor, the rights to all of the gold in Tract 364-4 of the Tyro Mine. The tract was a 2,500-ton block of ore. Equitable covenanted that the tract contained a minimum of 200 ounces of .999 fine gold. The lease obligated Hughes to pay the sublessor a royalty of 10 percent of the net smelter returns of gold recovered less haul costs. All minerals other than gold were to remain the property of Equitable. Hughes, as "owner of a divided interest in certain gold deposits and the mining rights and privileges apurtenant thereto," entered into a mining contract with Camozzi, as president of Gold Standard Mines, Inc. (or the mining company), an Arizona corporation. Under this agreement, Hughes granted the mining company the exclusive right to develop, mine, *541 and work the lease property and to process the gold therein. Further provisions of the mining contract were as follows: 3. (a) Mining Co. acknowledges receipt of $ 20,000 (total cash and notes) and shall perform the development work directed by Sublessee and to account for such work to Sublessee when completed. (b) All costs and expenses accruing or resulting from the exploration, development, mining and removal of the mineable and merchantable gold contained in the Property and the transportation of such gold to a collection or storage point adjacent to the Property shall be borne by the Mining Co. * * * (d) The Sublessee shall permit the Mining Co. to mine all gold-bearing material from his mine Property to produce all gold on the property. The Mining Co. will receive for its mine services thirty-five percent (35%) of the gold, or its value, mined and produced. * * * 13. Mining Co. shall look solely to earnings derived from gold produced as given by Sublessee to the Mining Co. in the Property and assets of the Sublessee for the payments and the performance of the Sublessee. In no event shall Sublessee be personally liable for the payments or the Performance of *542 the Mining Co. other than from proceeds derived from the production and sale of gold and in the event of any default, no deficiency or other personal judgment will be requested or entered against Sublessee with respect to the obligations contained herein. Pursuant to the above agreements, Hughes issued a check, dated December 31, 1980, to Equitable for $ 5,000. Hughes also executed a $ 15,000, 8-percent promissory note payable to Equitable by December 15, 1983. The Development of and Mining Operations at Tyro
The original mine operator at Tyro under the Gold Program was Camozzi. Camozzi, who specialized in underground mining, planned to develop the mine by first removing the overburden down to the main body ore, then running tunnels underneath such ore. The main body ore would then be extracted by an underground method referred to as "stoke mining." In late 1979 or early 1980, Camozzi subcontracted with James E. Fraley (Fraley), a specialist in open pit mining, to develop the Tyro Mine. In March 1980, Fraley and Alex Gold (Gold) organized Keystone Development and Mining, Inc. (Keystone), which undertook Fraley's contract and commenced the development of the mine. Gold *543 was Keystone's president. Difficulties were soon encountered with respect to the mining operations at Tyro. Camozzi became ill, was hospitalized, and died unexpectedly. In late 1980 or in 1981, the firm of John Pearce (Pearce), known as Basic Engineering, agreed to complete Camozzi's contract. Like Camozzi, Pearce specialized in underground mining. In the spring of 1982, however, Pearce was crushed to death by a slab of granite while working in another mine, and his death ended the contract in its early stages. Keystone then contracted to oversee operations at the Tyro Mine. Because Fraley was an open-pit miner, the mine plan was changed from essentially an underground effort to an open-pit effort. Gold was subsequently killed in an auto accident, leaving the operations of Keystone under the sole direction of Fraley. By June 1983, Keystone had removed overburden in preparation for extracting the main body ore, had constructed over 2 miles of roads providing access to the mine and three tailing ponds for use in the milling process, and had graded an area on which a 300-500 ton per day mill was constructed. The roads had no independent useful life apart from the mines. In *544 the process, Keystone excavated over 250,000 cubic yards of relatively low-grade ore and waste at a total cost of $ 2,539,016. In a letter to Equitable dated June 30, 1983, Keystone itemized the total cost of excavation as follows: Cost per
Cubic Yards
ton
Subtotal
Overburden removal
80,370 $ 10.40
$ 835,848  Mill area excavation
60,880 10.40  633,152
Mine road construction
30,926 9.60   296,890
Tailing ponds
construction  80,534 9.60   773,126
Total
252,710
$ 2,539,016
The mill that was constructed on the premises was in operation by 1983. Keystone milled and refined all of the overburden, producing almost $ 1 million in gold. In late 1983, the funds for the operation ran out. Fraley personally relocated to West Virginia, and the mine operations and development activities at Tyro ceased. The main ore body was not excavated. Equitable remitted all of the cash that it received from the Gold Program participants, between $ 500,000 and $ 600,000, to Keystone for its excavation work. Equitable did not pay the additional amount allegedly owed to Keystone. Equitable assigned to Keystone all of the promissory *545 notes issued by participants in the Gold Program allegedly for development work. Keystone did not collect on any of the promissory notes. Tax Treatment
On Schedules C attached to their 1979 and 1980 returns, petitioners claimed mining development deductions under section 616 in the amounts of $ 16,000 and $ 20,000, respectively. Petitioners reported no income from mining activities. Petitioners filed their returns using the cash method of accounting. Respondent disallowed the deductions in full. OPINION Respondent relies on several theories in challenging petitioners' mining development deductions for 1979 and 1980. First, respondent asserts that petitioners did not satisfy the requirements of section 616. In this regard, respondent contends that petitioners have failed to prove (a) that Hughes actually paid the alleged expenditures during the years at issue, (b) that such expenditures were paid for the development of the mine, (c) that such expenditures were not for capital improvements that were not currently deductible, and (d) that such expenditures were paid after the existence of ores or minerals in commercially marketable quantities had been disclosed. Second, *546 respondent argues that petitioners have failed to show that they were in the trade or business of mining or that such activity was carried on with a profit objective. Respondent predicates this argument on the objective factors set forth in section 1.183-2(b), Income Tax Regs. Finally, respondent argues that petitioners have failed to show that Hughes was at risk under section 465 for his full investment. Petitioners argue that they satisfied all of the requirements under section 616 in regard to their mining development deductions. Specifically, petitioners assert that a commercially marketable quantity of gold was disclosed prior to Hughes' transactions, that Hughes paid $ 20,000 in cash and a promissory note toward the development of the Tyro Mine, and that the mine was developed. Petitioners also argue that Hughes engaged in the activity with the objective of earning a profit. Finally, petitioners argue that Hughes' promissory note was fully recourse. We address petitioners' entitlement to the deductions for 1979 and 1980 separately. 1. 1979 Deduction
There is no evidence regarding the terms of any of the transactions that Hughes allegedly *547 entered into regarding the Gold Program for 1979. Petitioners attached to their petition copies of instruments allegedly executed by Hughes on December 31, 1979, in connection with his purported participation in the Gold Program in that year, including a promissory note, a mineral claim lease, a mining contract, and a $ 4,000 check to Equitable. In his answer, respondent denied all of petitioners' allegations with respect to these exhibits. These exhibits do not constitute evidence. Rule 143(b), Tax Court Rules of Practice and Procedure. Although petitioners introduced a copy of the $ 4,000 check to Equitable, there is no evidence that this amount was paid for mining development purposes. In view of the absence of evidence, we are not persuaded that in 1979 Hughes was engaged in the trade or business of mining or paid or incurred mining development expenses. Accordingly, we sustain respondent's determination for 1979. 2. 1980 Deduction
Section 616(a) provided in part: Except as provided in subsection (b), there shall be allowed as a deduction in computing taxable income *548 all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. This section shall not apply to expenditures for the acquisition or improvement of property of a character which is subject to the allowance for depreciation provided in section 167, but allowances for depreciation shall be considered, for purposes of this section, as expenditures. The deduction under section 616(a) is premised on a finding that the activity giving rise to the deduction is an activity engaged in with the actual and honest objective of making a profit. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986). Profit means economic profit, independent of tax savings. Seaman v. Commissioner, 84 T.C. 564, 588 (1985). While the expectation of making an economic profit need not be reasonable, a bona fide objective of making a profit must exist. Taube v. Commissioner, 88 T.C. 464, 479 (1987). The determination *549 of whether the requisite profit objective exists is to be based on objective standards, taking into account all of the surrounding facts and circumstances. Section 1.183- 2(a), Income Tax Regs.; Thomas v. Commissioner , 84 T.C. at 1269. The preponderance of the evidence establishes that in 1980 Hughes was engaged in the business of mining with the objective of making a profit. Foremost among our considerations here is that, at the time of Hughes' transactions, the Gold Program offered participants a reasonable opportunity of realizing an economic profit. Earl D. Harrison (Harrison), a mining consultant and engineer, appeared as an expert witness in Bryant on the issue of whether the Tyro ore body could be mined at a profit. Relying on the sampling of other geologists as well as his own, Harrison determined that a ton of ore at the Tyro Mine would contain at least 0.10 ounces of gold. Harrison determined the production costs of the ore to be $ 36 per ton. Harrison further determined the recovery rate of gold in the milling and refining process used at the Tyro Mine to be 90 percent. Respondent did not challenge any of these determinations. Assuming the *550 price of gold in mid-1980 to be $ 600 per ounce, Harrison projected the following profit on a 7,500-ton block of ore: 7,500 tons X .10 oz. per ton
750 oz.  Gold at $ 600 per oz. X 750 oz.
$ 450,000
Silver - Nominal
- 0 -   Total X .90 Recovery
$ 405,000
Production Costs
7,500 tons at $ 36 per ton   (270,000)
Profit Potential
$ 135,000
(The projection in the offering memorandum assumed a minimum price of $ 350 per ounce.) The factors in Harrison's projection differ from Hughes' transactions in only two respects. First, Hughes' tract of ore was 2,500 tons, rather than 7,500 tons. Second, the price of gold in December 1980 was $ 594, rather than $ 600, per ounce. Neither of these differences, however, is consequential in regard to the projected profitability of the venture. In Bryant, we noted several flaws in Harrison's profit projections with respect to the Summit Mine. Primarily, Harrison failed to explain the source of his estimates of the assay grades of the ore body. Moreover, his estimates were substantively inconsistent with other geologists' assay grades that Harrison referred to in his Summit Mine report. There are no *551 such flaws in Harrison's report on the Tyro Mine. Harrison testified that his assay grade of the Tyro ore body was based on his own testing. His test result -- a grade of at least 0.10 ounces of gold per ton -- is consistent with an admission by respondent in his brief that the approximate amount of gold in the Tyro Mine at the time of the mining in 1979 and 1980 was .12 ounces per ton. In view of Harrison's testimony and other evidence, we cannot conclude that the profit projections furnished in the offering memorandum were not reasonable. Those profit projections indicated that an outlay of $ 20,000 in cash and notes, which entitled a participant to sublease a 2,500-ton tract, might yield a net profit of $ 32,050. The projections were essentially predicated upon three assumptions: (1) that the tract of ore would contain at least 0.12 ounces of gold per ton, (2) that the price of such gold would be at least $ 350 per ounce, and (3) that the entire tract of ore would be mined and processed. The first two assumptions are supported by or are reasonably consistent with the evidence and respondent's admission as to the quality of the ore. Even after adjusting the quality of ore *552 assumed in the profit projection to comport with Harrison's conclusion, i.e., an average content of at least 0.10 ounces per ton and a processing recovery rate of 90 percent, the 2,500-ton tract was projected to produce about 225 ounces of fine gold. At this rate, the promoters would still have projected a net profit (225 ounces X a minimum of $ 350 per ounce, less 47 percent in royalties and costs, less $ 3,600 in interest expenses, less $ 20,000 in cash and note, or $ 18,137.50). Hughes and the promoters of the Gold Program may have been unduly optimistic in assuming that all of the ore would be mined and processed. Unforeseen circumstances, namely the deaths of mine operators, undoubtedly hampered the completion of operations. Overall, their assumption, albeit erroneous, that all of the ore would be mined and processed does not render the profit projection incredible. Respondent disputes that the venture provided any objective for profit. Respondent's main assertion is based on the premise that, "if the operation could not have been profitably mined by an operator, then an individual investor could expect to receive neither ore nor profit." To this end, respondent presented *553 the expert report and oral testimony of Leocadio P. Garcia (Garcia), a professional mining engineer. Garcia admittedly made only a cursory inspection of the mine and did not survey, sample, or map the mineral deposits. Essentially, his report was a rebuttal of the geological reports furnished to Equitable. Garcia concluded that a mine operator under contract with Equitable at the Tyro Mine would lose $ 4.78 per ton. Garcia reached this conclusion by first estimating the operator's revenue to be $ 15.93 per ton. His estimate of revenue was based on his assumptions that the average grade of ore was 0.13 ounces per ton, that the price was $ 350 per ounce, and that the mine operator's share of gold recovered from the sublessee's ore was 35 percent. Garcia next estimated the operator's total costs for mining, transportation, milling, and refining to be $ 20.71 per ton. Garcia excluded all costs for development, which were to be paid by the sublessee. Hence, the difference between Garcia's estimates of the operator's revenues and costs is his above-projected loss. Garcia also maintained in his report that "To break even at a grade of 0.135 oz/T (average grade according to production *554 records) the gold price should be, $ 20.71 divided by (.35 X .135) = $ 438 per ounce." Although we agree with respondent's premise in theory, we are not persuaded by the factual conclusions that respondent draws from Garcia's analysis. First, Garcia did not explain how he arrived at the price of $ 350 per ounce; apparently, he simply relied on the minimum price used in the offering memorandum profit projection. The price of gold at the time of Hughes' 1980 transactions, however, was almost $ 600, not $ 350, per ounce. Assuming Garcia's calculation of the price of gold at which the operation would break even, a mine operator in December 1980 could expect to reap a substantial profit by working the Tyro Mine. Secondly, we cannot ignore the reality that several independent mine operators apparently deemed the venture profitable enough to contract with Equitable to work the mine. In short, as of late 1980, the economics of the venture from the operator's perspective would not have undermined the possibility of profit from the Gold Program participant's perspective. Respondent also notes that the offering memorandum authored by Hughes emphasized tax benefits, particularly the immediate *555 4-to-1 write-off under section 616, and that Hughes did not realize a profit on the venture. We have no doubt that tax considerations were an element in Hughes' decision to engage in the subject transactions. Considering all of the facts and circumstances, however, we are satisfied that such considerations were not the only objective of his decision to participate in the venture. Finally, respondent asserts that Hughes had no expertise in mining and devoted no personal time to the Tyro mining activity. Whether or not this assertion is factual, we are satisfied that by consulting Blair and Camozzi, Equitable "procured sufficient advice and made sufficient inquiries to make a reasonable determination as to whether the * * * [Gold Program] would be a profitable venture." Taube v. Commissioner, 88 T.C. 464, 482 (1987). (Compare Zegeer v. Commissioner, T.C. Memo. 1987-590.) Because Hughes engaged the services of the various professional mining firms who actually worked the Tyro Mine, we give little weight to Hughes' failure to involve himself directly in the mining operations. Contrast Beck v. Commissioner, 85 T.C. 557, 574 (1985). *556 Before addressing whether Hughes paid any qualified development expenditures under section 616, we turn to whether Hughes was at risk with respect to his promissory note. Section 465 provides that, where an individual taxpayer engages in a trade or business, any loss from such trade or business for the taxable year shall be allowed only to the extent that the taxpayer is at risk with respect to the trade or business at the close of the taxable year. Section 465(a)(1), (c)(3)(A)(i). Borrowed amounts are considered to be at risk where, among other requirements, the amounts have been borrowed for use in the activity, and the taxpayer is personally liable for the repayment of the borrowed amounts or has pledged property, other than property used in the activity, as security for the borrowed amounts. Section 465(b)(2). Borrowed amounts are not at risk, however, insofar as such amounts are protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Section 465(b)(4). Hughes executed simultaneously the subject promissory note to *557 Equitable, an agency agreement with Equitable, and a mining contract with the mining company. In paragraph 2 of the agency agreement, Equitable agreed to deliver the note to the contract mining company. Equitable subsequently assigned and delivered all notes issued by the Gold Program participants to Keystone. In the mining contract between Hughes and the mining company, the mining company acknowledged receipt of Hughes' $ 20,000 in cash and note. Paragraph 13 of the mining contract expressly provided, however, that the mining company could look only to earnings derived from the production of gold and that "In no event" would the sublessee, Hughes, be personally liable for payments. There is no evidence that Hughes ever made a payment under the note. The terms of the instruments, when viewed together, establish that Hughes would not be called upon to pay any portion of the note. Thus, Hughes was not at risk with respect to the amount of the note. We therefore turn to whether Hughes paid in 1980 any mining development expenses under section 616, and if so, in what amount. Section 616(a), *558 quoted above, imposes three conditions for an expenditure to be currently deductible as a mining development expense. First, the existence of ores or minerals in a commercially marketable quantity must have been disclosed; second, the expenditure must be for the purpose of developing the ores or mineral deposits; and third, the expenditure must not be for the acquisition or improvement of depreciable property. Anderson v. Commissioner, 83 T.C. 898, 908 (1984), affd. without published opinion 846 F.2d 76 (10th Cir. 1988); H. G. Fenton Material Co. v. Commissioner, 74 T.C. 584, 587-589 (1980); Estate of DeBie v. Commissioner, 56 T.C. 876, 892 (1971). Neither the Internal Revenue Code nor the regulations define the concept "commercially marketable quantity" for purposes of section 616. Section 1.616-1(a), Income Tax Regs., however, suggests that a development expenditure is made, and hence that a commercially marketable quantity of ore is disclosed, when, in consideration of all the facts and circumstances, *559 "deposits of ore or other mineral are shown to exist in sufficient quantity and quality to reasonably justify commercial exploitation by the taxpayer." Nor do the statute or regulations define "development," although courts have interpreted the term in the context of section 616. In Santa Fe Pacific Railroad Co. v. United States, 378 F.2d 72, 76 (7th Cir. 1967), the Court of Appeals stated that "the meaning to be ascribed to the word 'development' is essentially the same as its common meaning in the mining industry." Thus, the development of a mine or deposit is commonly understood by authorities in the mining field to mean the activity necessary to make a deposit accessible for mining. The techniques employed in development -- stripping the overburden and constructing means for its removal (in the case of open pit mining), or sinking shafts and installing raises, tracks, pumps, et cetera (in the case of underground mining) -- are all designed to prepare the deposit for extraction or exploitation. * * * [Emphasis supplied. Citation omitted.] See Geoghegan & Mathis, Inc. v. Commissioner, 55 T.C. 672, 676 (1971), affd. 453 F.2d 1324 (6th Cir. 1972). *560 The taxpayer need not incur the development costs directly and may engage a contractor to make the expenditures on his behalf. Section 1.616-1(a), Income Tax Regs.
We are persuaded that a commercially marketable quantity of gold was disclosed as of the time of Hughes' 1980 investment. In reaching this conclusion, we accept as reasonable Harrison's testimony that the Tyro ore body existed in commercially marketable quantities. Harrison's conclusion was based in part on his investigation and numerous assay tests conducted on the ore body and the existing price of gold. Harrison also relied on the data set forth in the geological reports of Camozzi and Blair. See Rule 703, Federal Rules of Evidence.
In maintaining that a commercially marketable deposit at the mine was not disclosed, Garcia, respondent's expert, primarily asserted that a mine operator could not have operated profitably under Equitable at the mine. We have already concluded that this assertion is unpersuasive. Garcia's report did not directly challenge Harrison's analysis. Instead, Garcia chose to challenge the geological reports of Blair and Camozzi, whose written conclusions essentially *561 corroborate Harrison's. We have considered where Garcia disagreed with the Blair and Camozzi reports and, as discussed below, find his assertions unpersuasive. Garcia disagreed with Blair's and Camozzi's estimates of the size of the Tyro ore body, alleging that the maps attached to their reports that depicted the ore body dimensions were either flawed or too small to read. Based on Blair's "proper" mapping of only seven of the total nine sections of the Tyro ore body, rather than on his own tests, Garcia asserted that the total reserves in the mine were less than 400,000 tons. This assertion is not persuasive. It places undue emphasis upon mapping and ignores the results of the geologists' extensive testing, which were published in their reports and established the size of the ore body. Garcia's most persuasive criticism of the reports is that they did not include a feasibility study. According to Garcia, a feasibility study covers, among other subjects, mine development plans, the mining method, the process of recovering gold, the financial and marketing aspects, a project timetable, and a forecast of expected revenues and expenditures with the corresponding profit. We agree *562 that the reports of Blair and Camozzi were flawed in this respect. The omission is not fatal, however, in this case. Collectively, the Blair and Camozzi reports concluded that the quantity and quality of the ore at the Tyro Mine justified commercial exploitation. Harrison considered the feasibility of mining the ore body in reaching his own conclusion that there was a commercially marketable amount of ore. We are unpersuaded that Harrison's conclusions were unreasonable. In deciding whether petitioners paid any qualified mining development expenditures in 1980, we must determine whether Hughes' payments were made for development purposes, and if so, in what amount. Petitioners maintain that the entire $ 20,000 payment in 1980 was used for development purposes. For support, petitioners note that the terms of Hughes' mining contract designated his cash and note for development purposes. Further, petitioners assert that Keystone performed approximately $ 2.5 million in development work at the Tyro Mine. Petitioners have not shown with any specificity what portion of Hughes' payments were used for development purposes. There is no evidence of an accounting of mine development *563 expenditures incurred by Keystone on Hughes' behalf. That Keystone developed the mine and billed Equitable approximately $ 2.5 million does not by itself establish the amount of petitioners' mining development expenditures or their share of the total. Furthermore, the mere labeling of funds paid under a contract for mine development is not dispositive of whether such funds were actually used for "development" purposes within the meaning of section 616. This principle is borne out by the facts of this case. The evidence suggests that some development expenditures were incurred at the Tyro Mine. Keystone removed overburden and constructed mine roads at costs of $ 835,848 and $ 296,890, respectively, to make the deposit accessible for mining, i.e., for development purposes. Compare Santa Fe Pacific Railroad Co. v. United States, 378 F.2d 72, 76 (7th Cir. 1967); Rev. Rul. 86-83, 1986-1 C.B. 251 (removal of overburden); Amherst Coal Co. v. United States, 295 F. Supp. 421 (S.D.W.Va. 1967) (construction of mine roads). The roads had no *564 independent useful life apart from the mineral deposit. Accordingly, the road construction costs are not capital expenditures subject to the exception under section 616 for depreciable assets. See Amherst Coal Co. v. United States, 295 F. Supp. at 440-443. We are not persuaded, however, that the construction of tailing ponds, which were for use in the milling process, and the grading in the mill area served a development purpose. Thus, only $ 1,132,738 ($ 835,848 plus $ 296,890) of Keystone's $ 2,539,016 in excavation costs can be determined to have been for development purposes. Exercising our best judgment pursuant to Cohan v. Commissioner, 39 F.2d 340 (2d Cir. 1930), we estimate that Hughes' share of the total development costs exceeded his cash payment of $ 5,000. We reach this conclusion based on the following facts: (1) all of the cash paid to Equitable by the Gold Program participants was pooled and remitted to the mine developer, i.e., Keystone; (2) the total amount of such cash was between $ 500,000 and $ 600,000; and (3) qualified development expenditures made by Equitable ($ 1,132,738) exceeded the total cash payment. It is not necessary *565 to reach a more precise estimate, because we have concluded that Hughes was not at risk with respect to his promissory note. Petitioners' mining development deduction for 1980 is limited to the amount of Hughes' cash payment, i.e., $ 5,000. Finally, in his reply brief, respondent argues that Equitable must have retained a significant portion of Hughes' cash investment for promotional activities. Respondent's argument is belated and based entirely on speculation. In any event, we concluded in Bryant that this argument is meritless. Decision will be entered under Rule 155 in docket No. 17703-84. Decision will be entered for the respondent in docket No. 4752-86. Footnotes
*. 50 percent of the interest due on the entire deficiency for the year in issue. ** 120 percent of the interest accruing after December 31, 1984, on the entire deficiency.↩